## J. VIERRA *v.* GULSTAN F. ROPERT, Bishop of Panopolis, V.A., and EMIL WERY.

APPEAL FROM CIRCUIT JUDGE, FOURTH CIRCUIT.

SUBMITTED MARCH 27, 1896.                    DECIDED MAY 26, 1896.

JUDD, C.J., FREAR AND WHITING, JJ.

Specific performance will not be granted of a contract the terms of which are not proved to be definite and certain.

OPINION OF THE COURT BY WHITING, J.

This case comes on appeal by the plaintiff from the decree in equity of the Circuit Judge, Fourth Circuit, refusing specific performance of an alleged contract.

The plaintiff was in occupation of certain premises in Hilo, Hawaii, as a lessee of the Roman Catholic Mission, under a written lease dated June 1st, 1885, for five years, with a privilege of renewal for five years more, which expired May 31st, 1895. The plaintiff sues for specific performance of an alleged agreement for a renewal of the lease.

The bill is so constructed and contains so much matter which is mere surplusage, and is so confused in the statement of facts, that the Court finds great difficulty in ascertaining from the bill itself what contract the plaintiff relies upon.

In the 7th section of the bill plaintiff alleges as follows:

That on May 30, 1887, the Bishop of Olba, by his agent, Rev. Charles Pouzot, agreed in writing to execute a new lease, which written agreement was a condition precedent to improvements that had to be put on said real estate in said lease, that at

the expiration of the lease then held by Vierra, the same would be renewed to him at a monthly rental not to exceed twice what he was paying under the lease of June 1, 1885.

That before the expiration of this lease, the defendant, Bishop Gulstan (successor of Bishop of Olba, deceased), personally ratified the promise made by agent Pouzot that the said lease should be so renewed to orator if he wished.

In the 15th section of the bill plaintiff alleges:

"That Bishop Gulstan in writing notified Vierra that he might have a renewal of said lease if he wished it."

But plaintiff does not set forth this writing.

In the 16th section:

That Bishop Gulstan, in writing and orally, by himself and through his agents, agreed to give a new lease.

The plaintiff does not set forth the agreement, oral or written, except as alleged in the 7th section.

And the plaintiff, relying upon these alleged agreements, says that he was induced to make and did make permanent improvements at a large expenditure of money. And claims that they were in part performance of said alleged agreements of renewal of lease. And also claims damages.

The defendant Wery took a lease in June, 1895, of these premises from the co-defendant, Bishop Gulstan, and plaintiff alleges that it was in fraud of his rights to a renewal of the lease.

Various points were argued at the hearing by both parties, among which the questions first to be considered are whether any contract of renewal of the original lease or any contract for a new lease was made, and if so, was such contract sufficiently definite and certain in its terms that equity can enforce the specific performance of it?

The evidence offered was conflicting, and without considering the admissibility of oral evidence to make or vary the terms of a written agreement, or whether an oral contract within the statute of frauds can be allowed to be proven to uphold the allega-

tions of the bill, we find the following as most favorable for the plaintiff:

The Bishop of Panopolis is the head of the Roman Catholic Church in Hawaii, and has full control over its property within the islands, and the right to lease the same. That he is the successor of the late Bishop of Olba (deceased), who had the same powers and rights. The principal residence of the Bishop is in Honolulu.

On June 1st, 1885, the Rev. Father Chas. Pouzot (now lately deceased), at Hilo, in the Island of Hawaii, acting on behalf of the Bishop of Olba and his successors in office, made the original lease to the plaintiff.         .

1. On May 30, 1887, Father Pouzot wrote to Vierra:

"I hereby certify that I have promised to Mr. Joseph Vierra, at the expiration of the leases now from the Catholic Mission now in Hilo, to lease the same for twelve (12) years more if he wishes to do it at the rental of what the said lands will be worth at the time, and provided the head of the Catholic Mission approves of it.

"Hilo, May 30, 1887.

" CHARLES POUZOT, C. PRIEST."

2. Vierra testified that he had a conversation with the Bishop of Olba, at the Bishop's residence in Honolulu, in 1888, where he called to see the Bishop about this business, and said: "I had a written promise from Father Charles for a renewal of the lease. He asked for how long. I said for twelve years. He asked, 'What is the trouble, for there is quite a long time for lease to run yet?' I said I intended to make some alterations in the place and if it was all right that I could get the lease. He said I would have the preference of lease at the expiration of lease I held. I asked how much would I have to pay. He said he would not tell, but that Father Charles' letter was plain enough that I was to pay what it was worth at the time of expiration of lease. At that time the Bishop did not give any indication of the limit of the price to be paid—not at that time."

3. A second conversation with Bishop of Olba was held in 1891. Vierra testified: "Bishop said I should have a renewal of the lease at the expiration of the one held if I wished to have. I asked the Bishop how much I would be required to pay when we should renew the lease. He said that $17 was a little too cheap, but $25 is right rent I think you ought to pay. Think you can afford that. I told the Bishop that was satisfactory. No other person was present at these conversations. The Bishop of Olba died in February, 1892." Vierra further testified that he never showed this Pouzot document to any one, not even to either of the Bishops. His reason was that he did not think it necessary.

4. Vierra testified as to an oral promise by Bishop of Panopolis, successor to Bishop of Olba, on April 25, 1893. Bishop said Vierra should have renewal of lease without question, a renewal for twelve or fifteen years, not to pay to exceed twice what he was paying, $34 per month.

Bishop of Panopolis' testimony: "Vierra asked me for the renewal of the mission property in Hilo. I told him no, I cannot give you a renewal of the lease now. Then he asked me if I could have it at the expiration of the old one. And he said I asked you that because I have been told by somebody that the mission will not let me have it. I told him you can have it as well as anybody else, provided you will offer the mission the same price that other people offer. Then he asked me how much will he be charged for a renewal of the lease. I said nobody can tell now what the lands will be worth in two years from now, because this lease will expire in two years. I said it may be worth less than it is now, but as we have a new form of government and there is talk of annexation, I suppose, though, the land will be worth twice what it is now. He asked me to give up, resign the two years of lease he had now of the old lease if I consent to make a new one. I said no. Then he asked about the improvements he will have to put on his premises those two years. And I said you may be sure that you will have the renewal of the lease if you offer me the same price as others. Vierra

never told me at the time that he had a promise for a new lease from Father Charles Pouzot. I never saw this Pouzot letter.

5. Letter of Bishop of Panopolis, December 15, 1894, to Vierra:

"I beg you excuse for not answering your letter of the 31st of October. What could I said but what I told you myself in Hilo? At that time you wanted me to give you a prolongation of the lease. I refused to do it when you asked me how much I would charge for the new lease at the expiration of the old. As for the price, I told you it was impossible to mention any, because we had two years before us, saying also that you would have the privilege to take it at the same price others would offer for it. I made this last remark because you said somebody had told you that you will not have a renewal from us at any price. I repeat now what I told you then. I am willing to keep my word, but no more."

6. Conversation with Father Maxime of the mission at Hilo, Vierra's testimony: "Father Maxime told me that in consideration of what the Bishop had promised, of the renewal of the lease, that piece of land between Catholic Mission and Machado and the Barber, I ought to give it to them without charge, and that Machado ought to pay a dollar less, as he was paying too much, and if I did not take off the dollar, the mission would have to pay it. I agreed."

7. A second conversation with Father Maxime, Vierra's testimony: "Father Maxime told me he was going to Honolulu to see the Bishop off for Rome, and the matter of your lease will be all settled on then, and I will bring the lease with me for you. I told him I wished he would do so. I asked him how he could make a lease down there when I was not present. He said: 'I don't mean that, the lease will be made here.' 'It is a simple understanding; the matter will be talked over with the Bishop.' The lease is the same as the other except in price and length of time, which is twelve or fifteen years."

From this it appears that there are seven promises, oral and

written, made at different times during a long period of years and varying in their terms:

First—Father Pouzot, May 30, 1887, promises at the expiration of original lease to lease the same for twelve years more if he (Vierra) wishes to do it at the rental of what the lands will be worth at the time, and provided the head of the Catholic Mission approves of it.

Second—*In 1888,* Bishop of Olba orally promises that Vierra will have the preference of the lease at the expiration of the lease, to pay rent what it was worth at the time of expiration of lease.

Third—In 1891, Bishop of Olba orally promises a renewal of lease and thinks Vierra ought to pay $25.    Thinks he can afford it.

Fourth—April 25, 1893, Bishop of Panopolis promises orally, a renewal of lease for twelve or fifteen years, not to pay to exceed twice what Vierra was paying.    (This according to Vierra's testimony.)    But the Bishop says in his testimony that he refused a renewal, but told Vierra that he could have it as well as anybody else, provided he would offer the same price as other people offer.

Fifth—December 15, 1894, letter of Bishop of Panopolis, wherein he states that he refused a prolongation of lease and that Vierra asked how much he would charge for a new lease. And he told Vierra that it was impossible to fix any.    And that Vierra would have the privilege to take it at same price others would offer for it.

Sixth—Father Maxime in his first conversation again makes a change in the alleged contract whereby certain people were not to be disturbed by Vierra in their sub-tenancy and were to pay less rent.

Seventh—Father Maxime's second conversation with Vierra: "The lease is to be the same as the other except in price and length of time, which is twelve or fifteen years.

It is a well settled rule that courts of equity will not specifi-

cally enforce a contract that is not certain in its terms or capable of being made certain.

*Parker v. Cartwright*, 7 Haw. 596.

From the different promises or statements it will be easily seen that taking the evidence most favorable for the plaintiff and considering both the oral and written promises, there are at least two essential elements or terms of the alleged contract which are not certain or definite.

First—The term, which appears to be a mere renewal of the lease, that is, for its term of five years; a new lease or a renewal for twelve years; and a new lease or renewal for twelve or fifteen years.

Second—The rent. "As in the original lease;" "not to exceed twice the rental then paid;" "at the rental of what the lands will be worth at the time;" "to pay what it was worth at the time of expiration of lease;" "to pay $25 per month;" "the same price as other people offer;" that no price was to be fixed until expiration of lease.

What can the court select as the provisions of the contract to be enforced? If we select any of the provisions above set forth we cannot say that that was the one agreed on as part of the alleged contract. A court of equity cannot make a contract, nor can it in a bill for specific performance alter it and then enforce it.

The plaintiff has not proven any contract mutually agreed on and definite and certain in its terms. If contracts are not so certain in themselves as to enable the court to arrive at the clear result of what is meant by all the terms contained in them, they will not be specifically enforced. It would be inequitable to carry a contract into effect where the court are left in doubt as to the intention of the parties; for in such case the court might decree what the parties never intended or contemplated.

*Boston & Maine R. R. v. Babcock*, 3 Cush. 228.
*Grace v. Denison*, 114 Mass. 16.
*Parker v. Cartwright*, 7 Haw. 596.

*Condert v. Condert*, 43 N. J. Eq. 406.

*Hopkins v. Gilman*, 22 Wisc. 476.

*McKibbin v. Brown*, 14 N. J. Eq. 13.

*Lynes v. Hayden*, Adm'r, 119 Mass. 482.

It is claimed that the plaintiff has made improvements on the property in part performance of the oral contract, and that on that ground specific performance should be decreed. It is true that part performance will under some circumstances take an oral contract out of the statute of frauds. But for this purpose there must be clear proof of the contract itself and that the acts of part performance were made in reliance upon and in pursuance of the contract.

*Eyre v. Eyre*, 19 N. J. Eq. 102.

This has not been done in this case.

There were many other questions argued by counsel at the hearing, relating to want of consideration for the alleged promises, agency of the members of the Roman Catholic Mission at Hilo, notice to Wery, the co-defendant, of the alleged contract before he took the lease he now holds of the premises in question, admissibility of evidence, variance between the allegations of the bill and the proofs, and other minor points, all of which we do not deem it necessary to discuss.

The appeal is dismissed and the case is remanded to the Circuit Court, Fourth Circuit, for such further proceedings as may be necessary.

*G. F. Little*, for plaintiff.

*P. Neumann* and *F. M. Wakefield*, for defendants.