# KAPIOLANI ESTATE, LIMITED, *v.* LORRIN A. THURSTON.

## EXCEPTIONS FROM CIRCUIT COURT, FIRST CIRCUIT.

### ARGUED JANUARY 10, 1906.          DECIDED JANUARY 22, 1906.

### FREAR, C.J., HARTWELL AND WILDER, JJ.

ESTOPPEL IN PAIS—*estoppel of landlord by judgment against tenant.*

Plaintiff's title was under a conveyance of June 20, 1874, from K. to the king, of lands at Waimanalo and at different places in Honolulu under four Royal Patents less a portion in one of them sold to O. with whom K. was then living as his wife. After the king's death O., claiming as husband and heir of K., brought ejectment against C. and obtained a verdict and judgment for two apanas of the Waimanalo land leased to C. by the king's trustees. His niece and heir, L., wished W. R. C. to take charge of her lands. Before taking her deed of trust he called upon Kapiolani to ascertain whether she claimed the rest of the lands conveyed by K. and, after talking with her "of the Cummins' suit and the Waimanalo piece," asked, "Do you make any claim to any of these lands," and she said, "I have no claim whatsoever, make no claim on the lands." He said he explained to her that L. wanted him to act as her trustee and he "did not like to go into it if there was a lawsuit involved"; that he, relying on her statement, took the deed of trust, and afterwards, for $2000, conveyed this land

to the defendant with covenants of warranty. It was his impression that he talked with the queen dowager specifically about the different lands in the K. deed, but he could not say that he did so or recollected "any particular conversation about either one." After some talk, "she expressed some uncertainty of what I was talking about, then I told her that it was Okuu's lands, that Leialoha got these lands from Okuu, then she at once brightened up, looked intelligent about the matter. We talked quite awhile about these Okuu lands. * * * She understood at that time the whole thing, and that she had no interest in those lands and she so stated." Held: This was not the case of a prospective buyer, induced by the queen's statement to expend money to purchase the land or for improvements. As trustee he was not obliged to expend his own money or incur obligations in defending suits for the land. He did not inform the queen, and she could not have supposed, that he thought of conveying the lands with covenants of warranty which a trustee is never required to give. If her statement was a promise or expression of intention not to claim this land, it was not an estoppel. The evidence is too uncertain to justify the inference that she knew that W. R. C. was talking to her of any other lands than those which O. owned or had obtained by his judgment, and was not such as reasonably justified a prudent man, in reliance thereon, to convey the land with covenants of warranty.

The judgment against the tenant is not conclusive in this case upon the owner, nor does it make O.'s marriage, decided in that case, res judicata in this case. If one wishes a judgment to bind the landlord he must make him a party. This is true in this case although the administrator of the king's estate, if acting under a power of attorney from the queen and not as administrator, retained counsel to defend the case.

ID.—*evidence—admissibility of judge's notes and charge—reputation at the king's court concerning illicit relations of a retainer—expulsion from church for such relations—errors in rulings on evidence, when insufficient to require setting aside verdict.*

The judge's notes and charge at the trial of O.'s case are not evidence of the testimony of O. and other witnesses since deceased, nor as showing declarations of pedigree. To meet defendant's evidence that O. and K. were reputed to be living in wedlock the plaintiff could show their reputation of living illicitly. Reputation at the court, where O. was one of the retainers, was admissible. The fact that K.'s church expelled her from membership for her unlaw-

ful mode of living was not evidence and ought not to have been admitted, but in view of the other evidence upon that subject the error does not require the verdict to be set aside.

OPINION OF THE COURT BY HARTWELL, J.

The plaintiff having obtained a verdict in its action of eject-ment on a new trial granted upon the defendant's exceptions (16 Haw. 447), the defendant brings here a bill of exceptions, the most important of which relates to certain evidence upon which the defendant claims an estoppel in pais. The title origi-nated with Kahoopuipui (w) who, by deed of June 20, 1874, conveyed the land sued for, together with other lands, one of them situated at Waimanalo, R. P. 556, and the others in Hono-lulu, being land at Paliku, R. P. 4510, land at Kawaiahao, R. P. 2691, land at Kawananakoa, R. P. 1968, less a portion sold to Okuu by deed of October 12, 1854, and two parcels at Kukuluaeo, R. P. 1990, to the king, David Kalakaua, by whom it was devised to Queen Kapiolani, and from her descended to the plaintiff's grantors. The defendant claims the land through Okuu as husband and heir of Kahoopuipui by descent from him to his niece, Leialoha Ai, who conveyed it in trust to W. R. Castle, the defendant's grantor. The plaintiff's title is not good if, as claimed by the defendant, Okuu was the husband of Kahoopuipui, since he did not give his written consent to her conveyance to the king; and if, as claimed by the plaintiff, he was not her husband, then the plaintiff's right to the land depends upon whether Kapiolani, by her statements to W. R. Castle prior to his taking the deed of trust, estopped herself and those holding under her from claiming this land. Thus the defendant, in order to recover, must affirmatively show either a valid marriage or else an estoppel, there being no question that the plaintiff's evidence, taken by itself, establishes its title.

January 4, 1899, the king's trustees leased to Cummins for fifteen years at an annual rental of $10, apanas 1 and 2 of R. P. No. 556 of the Waimanalo land. March 15, 1892, after

Kalakaua's death, Okuu, as husband and heir of Kahoopuipui, brought ejectment for this land and obtained a verdict April 20. 1892, upon which a judgment was entered April 19, 1901. Okuu afterwards died leaving as his heir his niece, Leialoha Ai, who wished W. R. Castle to take charge of her lands and for that purpose to convey them to him as her trustee. Before execution of the deed of trust, Castle, having heard that Kapiolani made no claim to "the land," went to see her and, after speaking of the matter, talked with her "about Leialoha and Okuu and these lands," and of the Cummins' suit, about the Waimanalo piece, "then I said to her, do you make any claim to any of these lands, and she said, I have no claim whatsoever, make no claim on the lands." He further testified, "I explained to her why I came there, that Leialoha wanted me to act as her trustee (kahu) and that I did not like to go into it if there was a law suit involved," the conversation being in Hawaiian. He further testified that he relied on her statement, took the deed of trust and afterwards, for the consideration of $2000, sold the land now sued for to the defendant Thurston, giving a deed with covenants of warranty. On cross-examination he said, "I have an impression that we talked specifically about the Kawananakoa lands and the lands down here at Kawaiahao and the Waimanalo lands," but he could not say that they did; also, "I don't believe that I can recollect of any particular conversation about either one of the pieces." After he told her, "I wanted to know what interests she had in these lands of Leialoha's then, as I recollect, she expressed *some uncertainty of what I was talking about,* then I told her it was Okuu's lands, that Leialoha got these lands from Okuu, then she at once brightened up, looked intelligent about the matter, we got into a conversation about it, we talked quite awhile about these Okuu lands. * * * My impression is that I spoke about the Waimanalo lands, she assented at once and intimated that she understood that—she understood at that time the whole thing and that she had no further interest in those lands, and so stated." Upon the fore-

going statement the defendant claims that the plaintiff succeeding to Kapiolani's estate is estopped from bringing this action against himself as Castle's grantee.

In asking the queen whether she made any claim to any of these lands, Castle was not a prospective buyer, who, knowing that the legal title was in another than the proposed vendor, was seeking to learn, before purchasing, whether the owner would disclaim title or agree not to assert it. He was not contemplating purchase, but considering whether to take charge of Leialoha's lands. The fact that he desired to avoid annoyance from law suits was enough to prompt his inquiry, but Kapiolani's statement did not induce him to expend money to purchase the land or for improvements upon it. As Leialoha's trustee he was not obliged to expend his own money or incur personal obligations in defending suits for the land. Castle did not inform the queen and she could not have supposed that he thought of conveying the land with covenants of warranty, which a trustee is never required to give. Whether her statement was a mere promise, without consideration, or a statement of intention which she had a right to change, there would be no estoppel.

The rule was stated in *Re Bankruptcy of Thomas Spencer,* 6 Haw. 137 (1875). The bankrupt's agents had arranged with one of his creditors to defer placing him in bankruptcy and not molest the debtor. It was claimed that this estopped the creditor from bringing bankruptcy proceedings. Judd, J., held that there was no estoppel, no misrepresentation of facts, but merely a declaration of intention, which did not estop the creditor. "The intention of a party concerning his future action is necessarily uncertain. A person cannot be bound by any rule of morality or good faith not to change his present intention. The doctrine of estoppel wholly fails when the representation relates only to a present intention or purpose, because being in its nature uncertain and liable to change it could not properly form a basis or inducement upon which a party could reason-

ably adopt any fixed or permanent course of action." So Selborne, L. C., in *Madison v. Alderson,* 8 L. R. App. Cas., 473, says: "The doctrine of estoppel by representation is applicable only to representations as to some state of facts alleged to be at the time actually in existence, and not to promises *de futuro,* which, if binding at all, must be binding as contracts." "Estoppel by representations applies only where the representation is as to a fact in existence at the time, not where it is as to something yet to come or as to a matter of future intention." *Bank of La. v. Bank of New Orleans,* 6 L. R., H. L. 352, as cited in 3 Ch. Eq. Dig. 2146.

"If a party make a representation concerning something in the future it must generally be either a mere statement of intention or opinion, uncertain to the knowledge of both parties, or it will come to a contract with the peculiar consequences of a contract." Bigelow, Estoppel, 486.

Nor is it enough to create an estoppel that one relies on another's statement, it must reasonably justify the reliance to the average intelligence. "The representation or conduct must have been such as would naturally lead to the action taken. That is, it should be such as would justify a prudent man in acting upon it." Ib., 491.

We do not think that it would have been the part of a prudent man, in his capacity as trustee, to convey this land with covenants of warranty in sole reliance upon the queen's remark above quoted.

"Whether an estoppel results from established facts is a matter for the determination of the court." *Hayselden v. Wahineaea,* 10 Haw. 17. "The court, and not the jury, determines the question of equitable estoppel if there are no facts in controversy; no uncertainty as to the inferences to be drawn from them." *Peabody v. Damon,* 16 Ib. 447. But "the intention to influence another and the influence must be made clear. Estoppel does not arise from acts or words of which the meaning and significance are doubtful." *Kauhi v. Liaikulani,* 3 Ib. 356.

The statement relied upon as estoppel "must be plain, not doubtful or a matter of mere inference. Certainty is essential to all estoppels. The courts will not easily suffer a man to be

deprived of his property or security where he had no intention to part with it." Bigelow, Estoppel, 490.

When, as in this instance, the estoppel claimed is based on recital of language used by a former owner of the estate many years deceased, the importance of this view is emphasized.

The evidence is too uncertain, we think, to justify the inference that the queen knew that Castle was talking to her about any other lands than those which Okuu formerly owned, or which he had obtained by the judgment against Cummins. Although Castle says she knew perfectly well what her property rights were, this appears to us to have been a conjecture on his part based on nothing sufficiently definite to be regarded as evidence as he says it was not until he "told her it was Okuu's lands that she looked intelligent about the matter."

In order to sustain the defendant's position, it would be necessary to disregard the rules of law announced in several well contested and considered cases in this court. Thus "in order to an estoppel by conduct there must have been a misrepresentation or concealment of material facts known by the party to exist and with the intention of inducing a party ignorant of the facts to act upon the representations." *Kamohai v. Kahele,* 3 Haw. 530. "In order to estop a party by his conduct, admissions or declarations the following are essential requisites: that the party making his admission by his declaration or conduct was apprised of the true state of his own title; that the other party *was not only destitute of all knowledge of the true state of the title but of all means of acquiring such knowledge." Kela v. Pahuilima,* 5 Ib. 525.

In *Macfarlane v. Allen,* 10 Ib. 495, relied upon by the defendant, it was claimed that there was no estoppel because Mrs. Bishop improved the land knowing that it was Queen Emma's and relying upon the promise of Lunalilo to Kamehameha that he might have the land to build a retaining wall to the sea, and because Queen Emma, knowing of these acts, acquiesced in them. The court held that there was "no evidence to show

that Mrs. Bishop knew of the parole gift of Lunalilo, and, if so, she could not have relied upon it in making the improvements. Where a person takes possession of land of another knowing the true title he is a trespasser, and if he proceed to improve the land though the real owner seeing it says nothing, no specific opportunity occurring when he should speak, he is not estopped from thereafter claiming his land."

In *Goo Kim v. Holt,* Ib. 653, also relied upon by the defendant, the plaintiff, desiring to buy land inherited by two brothers, George and Peter, asked Peter if he did not have an interest in the land and Peter referred him to his brother George who, he said, had authority over it; that if Goo Kim bought he, Peter, had no right in it and would never claim any right to it. Goo Kim bought from George, and Peter, after receiving some of the purchase money, conveyed his half of the land to the defendant Holt. In an action by Holt for this land the court told the jury to find for him if Goo Kim knew that Peter was entitled to half of the property although he concealed or misrepresented the facts. This instruction was held to be wrong, this court holding that Peter, by telling Goo Kim that his brother could convey the property and that he himself had no authority to do so and no objection to George selling, acquiesced in the sale and waived his right to the land, since his declarations would naturally lead Goo Kim to suppose that he had released his claims. Neither of these cases sustains the defendant's contention.

The defendant further claimed that Okuu's judgment was conclusive against Kapiolani and that his marriage, established in that case, became res judicata in this case as well. In *Castle v. Kapiolani Estate,* ante, p. 61, we sustained the plaintiff's contention that the landlord was not estopped by a judgment in an action against his tenants because of his knowledge of and opportunity to defend it, and making no defense, saying: "If a plaintiff wishes to secure a judgment to bind the landlord, he must make him a party, since in no other way can he compel him to appear or become defaulted."

In ruling upon former exceptions, 16 Haw. 475, we held that evidence that the administrator with the will annexed of Kalakaua retained counsel to defend the Okuu case was properly excluded because there was no privity between the executor and the devisee, stating as one reason "that the executor neither represents the land nor the devisee unless (as does not appear in this case), the will imposes upon him some charge or duty concerning the land. The evidence, if admissible at all and not controverted, would be conclusive evidence that the devisee was estopped by the judgment in that case." At the last trial the defense showed a power of attorney from Kapiolani, authorizing the administrator to manage her business, collect rents and income from lands that came to her under her husband's will and from those held by his trustees for payment of his debts, to manage the lands and to lease part of them at reasonable rental; "and for the purposes aforesaid" granting the attorney power to execute instruments "according to our agreement and to sue or to defend all cases at law or in equity." The defendant claims that this made the evidence admissible, as to engaging counsel to defend the case, showing that the administrator in so doing was acting under his power of attorney. Several considerations interfere with and perhaps preclude this inference. Express authority was unnecessary for under the circumstances of this case the law authorized the administrator thus to protect the interests of the estate. The power of attorney authorized the defense of cases "for me and in my name." This was not such a case. But we prefer not to decide this question upon mere inference but as a matter of law. On the reasoning in *Castle v. Kapiolani Estate*, supra, a defense in the tenant's name is not enough to bind the landlord. In *Un Wong v. Kan Chu et al.*, 5 Ib. 225, ejectment against a lessee who had sublet to persons not made defendants, a nonsuit because the defendants "were shown not to be in possession of the premises," was held to have been properly refused. The court, while holding that it was sufficient that the occupants held under the defendants, said:

"Of course the judgment will only be operative against such persons as are made parties to the suit."

As said in *Mossman v. Hawaiian Government,* 10 Ib. 421, "The general rule is that a judgment is void as to one entitled to be heard who had no notice, actual or constructive; but if there was notice, then as to the subject of the proceeding the judgment is in every other proceeding conclusive, not only upon every point that was litigated in the first proceeding, but upon every point that might have been litigated; but as to a different subject, the judgment is conclusive only upon points actually contested and adjudicated in the first proceeding." The notice here meant is equivalent to a process, being the judge's order to appear and show claims at final distribution of an estate.

The numerous American decisions which hold that when a covenantee, sued in ejectment by an adverse claimant, notifies the covenantor of the action and requests him to defend the latter is bound by the judgment, "would seem necessarily to assume that in the states in which they were rendered some provision of law or some practice existed by which the covenantor, when notified to appear, could procure himself to be admitted as a party defendant to the suit." Maupin, Marketable Title, Sec. 175.

We have no statute or practice which conforms with equity practice in respect of interests affected by a case by enabling a tenant to substitute his landlord as defendant in ejectment or the landlord, on his own petition, to become defendant. If the defendant, after notifying his landlord and giving him an opportunity to defend the action, is evicted his failure to defend may estop him as against the tenant from disputing the eviction; but under our statutes and practice the estoppel ends there. We therefore reaffirm, without modification, the rule in *Castle v. Kapiolani Estate,* "if a plaintiff wishes to secure a judgment to bind the landlord, he must make him a party, since in no other way can he compel him to appear or become defaulted."

It follows from these conclusions that the court correctly excluded evidence that the administrator retained counsel and

denied the defendant's requests for instructions framed upon his theory of these matters, as well as requests, based upon the same grounds, for a directed verdict and judgment non obstante.

The defendant presented, and the court refused to admit as evidence, the notes of the judge and his charge to the jury in the Okuu trial to show the testimony both of Okuu and of the witnesses. The defendant claims that the notes and charge ought to have been admitted because Okuu's evidence, he having since died, would be in the nature of declarations concerning pedigree, and because the judge's recital of evidence in his charge, which by statute was required to be in writing, was official. We know no rule for thus perpetuating evidence or which makes this an instance of declarations concerning pedigree made by a deceased member of the family.

Evidence that Okuu and Kahoopuipui were reputed to be living in wedlock having been given by the defendant as part of his proof of their marriage, the plaintiff could meet the evidence by showing their reputation of living together illicitly. Thus "where marriage is attempted to be established by reputation we think the defendant might be allowed to weaken the evidence by showing that the reputation was not general but was divided." *Northrop v. Knowles,* 52 Conn. 524.

Iaukea testified for the plaintiff that while secretary for the king's chamberlain he knew them as retainers at the court and by general reputation there that they were living illicitly. We have no doubt that the general reputation at court of their way of living was evidence. "It matters not that the witnesses had only known the deceased in prison. There was a large community there, and a man can have a general character there as well as elsewhere." *Thomas v. People,* 67 N. Y. 224. Reputation is "an honest reflection of the opinion of the people generally in the neighborhood where the person lives and is known." *Brown v. U. S.,* 164 U. S. 224.

The above rulings on evidence apply to the defendant's exceptions to the evidence of ill repute and the exclusion of the judge's notes and charge in the Okuu trial.

An important question in this case, on which the plaintiff's brief or argument throws little light, is the admissibility of the evidence of Rev. H. H. Parker, pastor of Kawaiahao church, that the church authorities, including himself, remonstrated with Kahoopuipui for living with Okuu without marrying him; that she did not observe their monitions and was therefore expelled from the church by removing her name from the list of its members.

The defendant claims that the fact of expulsion from the church was *res inter alios* and not evidence of the woman's unlawful mode of living. The plaintiff says that it was one of the circumstances surrounding the transaction and explanatory of the main facts and that it showed her general reputation. The action of the church in dismissing her from membership was unnecessary for explaining the evidential facts to which the witness had testified, namely, the remonstrance with her, her tacit acquiescence in the charge and her continuing the illicit relation. No logical reasoning, no theory of hearsay or res gesta makes this action of the church a probative fact for the jury to consider. Its admission as evidence, against the objection of the defendant, and the refusal of his request to take it from the jury was erroneous.

But we do not think that on this ground alone a new trial ought to be granted. The tendency of American decisions is to enlarge the scope in civil cases of the doctrine of harmless error in admitting evidence. Wrongful exclusion of evidence is far more likely to harm than is wrongful admission. An appellate court ought not to be so ready to order a new trial upon conjecture that the jury may have based its verdict wholly or in part upon the irrelevant testimony as in cases in which a party was not allowed to make out his case. The modern jury is apt to draw its own inferences from evidence before it rather than to adopt the conclusions of an ecclesiastical tribunal. The case has had two trials with the same result, although the expulsion was not shown at the former trial. The judge who tried the case

had time after the verdict to reconsider his ruling and in deny-
ing a new trial probably thought that the verdict was right. A
trial judge properly refuses a new trial for admission of irrele-
vant testimony if he thinks that upon the other evidence the
verdict was right and probably not influenced by the objection-
able testimony, as in granting a new trial he is apt to regard
the verdict as wrong.

We think that the evidence of the pastor so clearly showed
that the woman was living an immoral life that it was not
strengthened by his testifying that the church therefore dis-
missed her from membership.

By the early English rule erroneous admission or exclusion
of evidence did not authorize setting aside the verdict "unless
upon all the evidence it appeared to the judges that the truth had
thereby not been reached." 1 Wigmore, Evidence, Sec. 21. But
about the year 1835 English courts began setting aside verdicts
for admission of irrelevant testimony unless the same fact was
otherwise proved. This continued until the Judicature Act of
1873, which restored the original rule, enacting that a new trial
should "not be granted for improper admission or rejection of
evidence unless in the opinion of the court some substantial
wrong had been thereby occasioned on the trial." During forty
years prior to this act "the rule was that if any bit of evidence
not legally admissible, which might have affected the verdict,
had gone to the jury, the party against whom it was given was
entitled to a new trial." Coleridge, C. J., in *R. v. Gibson,*
L. R., 18 Q. B. D. 540.

Many American courts have adhered to the original rule.
Wigmore, supra, citing among cases examined, *State v. Beaudet,*
53 Conn. 539, "unless manifest injustice had been done on the
whole case there is no ground for a new trial. There appears
to be good reason for the verdict;" *Gardner v. R. Co.,* 135 Mo.
90; *People v. Fernandez,* 35 N. Y. 59; *Dyer v. Union R. Co.,*
55 Atl. (R. I.) 668; *Com. v. Lenousky,* Ib. (Pa.) 977. And
see *Motes v. U. S.,* 178 U. S. 475. In *Fid. Mut. Life Assn. v.*

*Mettler,* 185 Ib. 320, an action to recover on insurance policies upon the life of one Hunter, it was held that evidence of a report in Hunter's family concerning his death was erroneously admitted, but "it is difficult to see that it could have been so prejudicial as to be fatal to the verdict, for it amounted to nothing more than the assertion of Mrs. Mettler's belief and the acceptance by the family of that belief as their own. In other words, it cannot be supposed that the jury regarded the evidence as tending to establish the fact of death when it purported only to state Mrs. Mettler's belief and the family's concurrence."

This court in several cases has declined to order a new trial for errors which appeared to it to be harmless. Thus in *Merricourt v. Norwalk Fire Ins. Co.,* 13 Haw. 221, "Although we do find that the trial judge was clearly in error in some of the rulings on the admission and exclusion of evidence complained of, still we do not consider these errors of sufficient gravity to justify us in setting aside the unanimous verdict of the jury and remanding the cause for a new trial." So in *Gay v. Farley,* 16 Ib. 79, in respect of certain evidence of doubtful relevancy, "the error was harmless, for not only was there ample other uncontradicted evidence to require the findings as to the fact and the amount of the shortage, but some of that evidence consisted of admissions, as to both the fact and the amount of the shortage, made by Wright before his resignation and in connection with his official duties, so that the admissions objected to were at most merely cumulative." Upon an erroneous exclusion of evidence in *Territory v. Wright,* Ib. 144, "We cannot, however, say that its exclusion was prejudicial to the defendant or was reversible error, the defendant having substantially admitted the receipt of the money." In *Wong Hoon Kan v. Lui Yan,* Ib. 736, upon the same subject, "If it was error to allow this question, the error was harmless, for the issuance of the warrant and the arrest of the plaintiff on defendant's complaint were fully shown otherwise."

As a general rule we think that new trials ought not to be granted for errors in rulings upon evidence when there is no reason to believe that they affected the verdict.

The defendant's exception to an instruction upon the presumption of continuance of illicit relations was not relied upon and is untenable, *Godfrey v. Rowland,* Ib. 387, as is also his exception to the admission in evidence of a lease of the land by the king's trustees which was "evidence of claim of ownership and acts of ownership." *Kapiolani Estate v. Thurston,* Ib. 475. His exceptions to instructions as to adverse possession were abandoned in argument.

Exceptions overruled.

*W. A. Kinney* and *S. H. Derby* (*Kinney, McClanahan & Cooper* on the brief) for plaintiff.

*D. L. Withington* (*Castle & Withington* on the brief) for defendant.