WILLIAM C. POKA *v.* NANI HOLI, ALSO KNOWN AS LEINANI HOLI, INDIVIDUALLY AND AS ADMINISTRATOR DE BONIS NON OF THE ESTATE OF ALICE HOLI, DECEASED.

No. 4086.

August 17, 1960.

Tsukiyama, C. J., Marumoto, Cassidy, Wirtz and Lewis, JJ.

This action for specific performance was commenced on January 10, 1957, against Nani Holi, individually and as administrator de bonis non of the estate of Alice Holi, who died January 28, 1937. Defendant appealed from a judgment for plaintiff, entered April 30, 1958, on a decision rendered April 10, 1958.

Plaintiff William Poka, a half-brother of deceased, was appointed administrator of her estate on April 13, 1937. On March 28, 1956, he was ordered removed for failure to file his accounts, among other reasons. Thereupon Nani Holi, the husband of the deceased, defendant herein, was appointed administrator de bonis non.

The complaint alleged an agreement between plaintiff, sometimes referred to hereinafter as "William," and his half-sister, the decedent, hereinafter referred to as "Alice," concerning certain improved real property at 287 Kalihi Street, Honolulu, containing an area of 7500 square feet. This property belonged to Alice, who had acquired it from her former husband, one Fernandez.

It was alleged in paragraph 3 of the complaint that in December, 1930, William and Alice mutually agreed that if William would take possession of the property, pay the balance of the mortgage payments then due and owing upon said property, the insurance premiums, and all other expenses in connection with the improvement and upkeep of the property, Alice would execute and deliver to William a deed of the premises upon the completion of all mortgage payments connected therewith. It further was alleged that this agreement was entered into "for the reason that said Alice Holi was not able to meet the mortgage payments and other expenses relative to said premises and thereby faced the possibility of a mortgage foreclosure, and for the further reason that the relationship between said Alice Holi and her husband, said Nani Holi, was at that time strained and bitter, and it was the desire and inten-

tion of said Alice Holi that the property should go, not to said Nani Holi, but to plaintiff."

On March 9, 1957, the court denied defendant's motion to dismiss and motion for summary judgment. On March 20, 1957, defendant filed his answer, denying the allegations of paragraph 3, as well as other allegations, asserting that William was a tenant of the deceased, and presenting the defenses of laches and nonjoinder of parties, which earlier had been presented by motion.

Trial was held July 30 and August 29-31, 1957. Previously, considerable testimony had been taken in the probate proceedings and during the hearing of the motion for summary judgment. It is the testimony taken at the trial, chiefly William's, to which we refer below.

William testified that he moved to the Kalihi Street premises from the Kamehameha Alumni Club House, December 30, 1930. Previously, he had lived on Lusitana Street, paying a rental of $25.00 per month. When his wife, a school teacher, returned to Maui at the beginning of the school term, he moved to the Club House, where he paid only $8.00 per month. He had steady employment and was contemplating taking over a place on Pacific Heights which a friend was about to lose by mortgage foreclosure, and which he could obtain by assuming the mortgage.

Alice had had unsatisfactory tenants and was behind on the mortgage payments on her place. She was afraid she was going to lose the property, and asked William to help her pay the mortgage. William reminded Alice that she already owed him the $300 she had borrowed from him at the time of the death of their mother. He told Alice that he was unwilling to make the mortgage payments unless the property was turned over to him. According to William, Alice said: "Yes, I'll turn this property over

 

to you because Nani Holi is always gallivanting with other women."

William told Alice he was willing to make the mortgage payments and continue staying at the Kamehameha Alumni Club House "on condition that you turn the property over to me after I pay the mortgage." However, Alice said: "Why pay the extra rent. You stay here until you pay the mortgage. Then the property is yours."

At one point, on cross-examination, William testified that "she owes me money, and the fact that she knew she couldn't pay it, and that's why she made this agreement." At another point, upon questioning by the court, he testified that his sister wanted to do something for him.

Alice told him that there was a $1400 mortgage on the place. The mortgage payments were $35 per month. He understood that the mortgage was made in February or March of 1930, and figured that during the period of approximately nine months which had elapsed Alice had paid about $300, which would leave about $1100 to $1200 for him to pay. He did not know whether the interest was 6% or 8%.

The former tenants had been paying rent of $35 per month for a fully furnished house. When William moved on the premises he found that Alice had taken out most of the furniture. The place was in very bad condition.

William paid the sum of $35 per month from the time he moved onto the premises, and continued paying for seven years. He has remained in possession and was in possession at the time of the trial.

At first, for a few months, William paid the $35 per month to Alice, but thereafter, "I made a point to go down to Union Trust and pay myself." He testified that even before Alice's death it was he who paid the real property taxes, but there is no finding on this point and some confusion in the testimony.

After moving in, William expended $2000 to remedy the bad condition of the premises. He had no agreement concerning the making of these improvements. The agreement concerned only his making the mortgage payments, he testified.

Although William supposed that what he had to pay was the $1400 mortgage, less whatever Alice already had paid, in fact there were two mortgages on the place, both made in February, 1930, one for $1400, and the other for $225. Both were at 8% interest.

Alice put further mortgages on the place in 1933 and 1936, adding $984.95 to the indebtedness secured by the property. It was not until January, 1938, after the death of Alice, that the property was cleared of mortgages. William then learned for the first time that additional mortgages had been put on the property after 1930. The original mortgages were held by Union Mortgage and Guaranty Company, and the later mortgages by Union Trust Company. Both companies are referred to herein as "Union Trust Company."

Instead of the amount originally contemplated William paid more than $2900 ($35 per month for seven years).

In addition to the $300 which William had loaned Alice at the time of the death of their mother, William let Alice have more than $1700, $300 to $400 a year, during the period he was making the mortgage payments. It was because Alice was turning the property over to him that he let her have this money, he testified. When Alice would ask him for money she would remind him that he was going to have the property. Though he insisted in his testimony that he would have been entitled to the property even if he had not let Alice have this money, that would have looked like a hard bargain, he felt. At times he spoke of this money as loaned. He also spoke of it as a "grant."

William saw Alice in the hospital shortly before she died. At that time she did not expect to live. He reminded her about the property, and she asked him to prepare papers so that she could "turn over all these things." He told her he would bring a notary in the morning, but she died about two or three a.m.

The entire agreement was verbal. William accepted Alice's word, though he must have known she was not trustworthy. He testified that "probably" she was convicted of larceny some time between 1931 and 1933. She was a heavy drinker, as testified by defendant.

Two of William's witnesses testified to conversations touching upon this matter. One witness testified on direct examination that at a party in 1932 or 1933 the guests were talking about what would happen when they died. Alice was asked: "Hey, Alice, when you die, who going to take your place?" She answered: "Oh, no worry. My brother, Willie, take um." The other witness testified on cross-examination that it was said in his presence that William "did not need to worry because she had security for him." It is not clear who said this. The court attributed the statement to Alice. However, the witness had testified on direct that he had discussed money matters with William, not with Alice.

After Alice's death plaintiff retained an attorney who caused William to be appointed administrator. William testified that he told this attorney about the agreement concerning the property. This attorney was disbarred in 1940. William subsequently had other attorneys, and he testified he also told them about the agreement, but no one did anything about establishing his rights until he retained his present attorney. One of William's former attorneys, who represented him in July and August, 1956, called as a witness by defendant testified on cross-examination that William "felt that he was entitled to the

house on his conversation with the deceased. She had promised that he was going to get the house, and she was going to will him the house * * *."

The only testimony as to the value of the property was that of Robert W. Quinn, an assistant assessor of real property taxes, who testified that the tax records showed a value in 1931 of $3,062 for the land and improvements. That was the appraised value and "our figures are supposed to represent 100% of the market value in those days." In 1938 the property was assessed at $1,412, representing 60% of the full market value, which would indicate a value of $2,350. In 1956 the assessed value was $10,027, representing 70% of the full market value, indicating a value of $14,324.

In the decision rendered April 10, 1958, the court found (Finding No. 2) that in December, 1930, Alice and William "entered into an oral contract in which Poka [William] agreed to pay off the indebtedness of Alice Holi, secured by a mortgage with the Union Mortgage and Guaranty Company, Limited, and upon the payment of said indebtedness by William C. Poka, Alice Holi would convey the property to him."

The specifications of error attack the trial court's above-quoted Finding No. 2 and other findings, and further assert that the trial court erred in failing to find that plaintiff was barred by laches, equitable or judicial estoppel, or the principle of res judicata; that there was no consideration for the alleged contract and plaintiff was barred by "duress in overreaching his sister" and by the doctrine of clean hands; and that plaintiff's proof of the alleged contract does not measure up to the requirements of a specific performance case or the Statute of Frauds. At the oral argument a further specification based on the nonjoinder of heirs was abandoned.

The court found William a credible witness. Never-

theless, there were inconsistencies in William's testimony, particularly when compared with former testimony, and a good part of the decision below consists in a reconciliation of these inconsistencies. This is relevant in connection with the defense of laches, *infra*. William was testifying concerning conversations that took place more than twenty-five years previously. The passage of time had affected the credibility of his testimony.

The above-quoted finding is in terms of a bilateral contract. A unilateral contract was alleged. In any event, if William was to receive the property as claimed by him, then the payment of the mortgage was for William's own benefit. The value of the property exceeded the amount of the mortgage, and there was no testimony that Alice was in fear of a deficiency judgment. It was because she wanted to save the property from foreclosure that she went to William. During their conversations, according to William's testimony, Alice acceded to his demand that he receive the property. If so, this was a parol promise by Alice to make a gift to William of the equity.

However, under some circumstances a parol gift is quite similar to a parol sale of land. 24 Am. Jur., *Gifts*, § 68; 38 C.J.S., *Gifts*, § 57. Assuming that a specifically enforceable right might be acquired under such an arrangement by reason of possession taken and expenditures made or benefits foregone in justifiable reliance thereon, nevertheless there are circumstances in conflict with plaintiff's theory as to the contract made.

William testified that he was induced to give up the opportunity to acquire property on Pacific Heights which would cost him only the mortgage payments, $55 per month in that case. While there is a finding that when William took possession of Alice's property it was in lieu of the Pacific Heights property, there is no finding that Alice knew of this. In the probate proceedings William

had testified as to the Pacific Heights property that he told his sister: "Gee, I cannot be able to buy my place [referring to the Pacific Heights property] and at the same time help you." At another point in this former testimony he said he told his sister that if he lived at Kalihi Street "for free" he still would have the opportunity of securing the Pacific Heights property. He was in error as to the latter statement, he testified at this trial. He wasn't able to meet the payments at two places at the same time.

If Alice was turning the property over to William without reserving any interest in herself, there was no reason why she should urge him to accept this gift instead of acquiring the Pacific Heights property. And if such a gift was her intention, there was no reason for her to require William to pay off the mortgage before he received the property. If we accept the view that William did expect to receive the Kalihi Street property and did rely thereon, giving up the Pacific Heights place as too much for him to handle additionally and then finding himself faced with $2,000 in expenditures to make the Kalihi property livable, there still remains the question whether a prudent man would have relied on Alice's statements. *Kapiolani Estate* v. *Thurston*, 17 Haw. 312, 317, reh'g den. 17 Haw. 346.

As held in the cited case, a mere statement of intention which the declarant has a right to change and which does not "reasonably justify the reliance" asserted as the basis of the claim, is not enforceable in equity. On the other hand, a promise which, as contemplated by the promisor, induces reliance thereon is enforceable in equity if irreparable injury otherwise would be sustained. *Vierra* v. *Shipman*, 26 Haw. 369, 27 Haw. 457; *Motonaga* v. *Ishimaru*, 38 Haw. 158, reh'g den. 38 Haw. 205.

Clear, definite and unequivocal evidence is required to warrant specific performance of a parol contract to convey

land. *Molokai Ranch, Ltd.* v. *Morris,* 36 Haw. 219; 155 A.L.R. 76, 80. "* * * such a contract must be found to exist with all the requisites of an enforceable contract in equity had it been in writing." *Molokai Ranch, Ltd.* v. *Morris, supra.* And as further stated in that case: "Mere expressions of an intention to convey land at a future time which have not culminated in a binding agreement are not enforceable in equity." Even in the case of a written contract certainty of the contract is a requisite to specific performance. There must be shown the "definite and final intent of the parties and that no further negotiations were contemplated." *Francone* v. *McClay,* 41 Haw. 72, 79, reh'g den. 41 Haw. 650.

Had the contract set out in William's testimony been in writing, the construction of the contract nevertheless would have been arguable because of circumstances which indicate that Alice was not turning the property over to William without reserving any interest in herself. The contract not being in writing there is the added hazard of the exactness of William's memory as to the very words used by Alice some twenty-seven years before. Alice's own version of the arrangement, she having died, can be derived only from her actions during her lifetime. Her making of additional mortgages in 1933 and 1936 was inconsistent with and may have been a repudiation of William's version of the arrangement (see *Levy* v. *Lovell,* 24 Haw. 716). At the very least it was in breach thereof, with consequences discussed below.

It might be immaterial whether the agreement was exactly as William testified if, in any event, William were equitably entitled to the property now that Alice is dead. But the judgment below cannot stand because Alice's statement that William was to have the property may very well have been a mere statement of intention on which William did not justifiably rely as a binding agree-

ment. From the full record we conclude that there is lacking the unequivocal showing of the definite and final intent of the parties required for specific performance.

In addition to this conclusion that the evidence was insufficient to sustain specific performance, we conclude that the defense of laches was well taken. The specification that: "The trial judge erred in failing to consider the defense of laches and in failing to find that plaintiff was thereby barred" is the only other specification that needs to be considered.

Preliminary to considering the defense of laches we consider the nature of this proceeding. R.L.H. 1955, chapter 321, relates to specific performance of a contract to convey real estate after the death of a person "who is bound by a contract in writing." This chapter 321 was part of chapter 20 of the Civil Code of 1859, entitled "Of the Prevention of Frauds and Perjuries in Contracts, and in Actions Founded Thereon," which evidently was taken from chapter 74 of the Revised Statutes of Massachusetts, 1835. However, the Massachusetts statute did not contain the requirement that the complaint be filed within one year after the grant of administration, which has appeared in our statute from the inception. See also General Statutes of Massachusetts, 1860, c. 113, sec. 2, and compare S.L.H. 1878, Act 15, now R.L.H. 1955, § 335-2(c). In Massachusetts it was held that under the general grant of equity jurisdiction specific performance could be had of an oral contract despite the limitation of specific performance to written contracts, elsewhere contained. *Somerby* v. *Buntin,* 118 Mass. 279, 287.

A suit for specific performance under chapter 321 may be brought against the personal representative of the deceased alone, though the heirs have the legal title under the common law rule. *Looney* v. *Trent Trust Co.,* 23 Haw. 208; *Fulwider* v. *Peterkin,* 2 Greene (Iowa) 522, 1850.

Although there are obvious advantages to be had by suing under chapter 321, plaintiff has not cited that chapter, probably because the contract is not in writing or because of the one year provision of section 321-1. Defendant has not pleaded the one year provision as a bar. The suit is under the general equity jurisdiction of the court. Joinder of the administrator de bonis non in his official capacity brings before the court only the right of possession and power of sale held by a personal representative under R.L.H. 1955, chapter 317.

The heirs have not been determined, and it may be that others should have been joined. See 43 A.L.R. 2d, 938. However, defendant has waived the defense of nonjoinder of parties, and we have considered the case accordingly.

Equitable relief will be refused when, during inexcusable delay, the evidence has become obscured and, under the circumstances of the case, it is too late to ascertain the merits of the controversy. This rule particularly applies when some or all of the parties to the contract have died. *Olepau* v. *Rahapa,* 7 Haw. 175, 179; *Ishida* v. *Naumu,* 34 Haw. 363, 373 (in which the rule was recognized though deemed inapplicable); *Smick's Administrator* v. *Beswick's Administrator,* 113 Ky. 439, 68 S.W. 439; *Smith* v. *Thompson's Administrator,* 48 Va. (7 Grat.) 112; *Nelson* v. *Triplett,* 99 Va. 421, 39 S.E. 150; *Rives* v. *Morris,* 108 Ala. 527, 18 So. 743; *Salvo* v. *Coursey,* 220 Ala. 300, 124 So. 874; *Reeves* v. *Weber,* 111 N.J. Eq. 454, 162 Atl. 566, following *Lutjen* v. *Lutjen,* 64 N.J. Eq. 773, 53 Atl. 625; *First National Bank* v. *Lytle Coal Co.,* 332 Pa. 394, 3 A. 2d 350; *Lewis* v. *Bowman,* 113 Mont. 68, 121 P. 2d 162; *Evans* v. *Steele,* 125 Tenn. 483, 145 S.W. 162, 165; *Gillons* v. *Shell Co. of California,* 86 F. 2d 600, 609; *Maschmeijer* v. *Ingram,* 97 F. Supp. 639 (D.C.N.Y.); 30 C.J.S., *Equity,* § 119. In *Hammond* v. *Hopkins,* 143 U.S. 224, 250, the court said:

"The rule is peculiarly applicable where the difficulty of doing entire justice arises through the death of the principal participants in the transactions complained of, or of the witness or witnesses, or by reason of the original transactions having become so obscured by time as to render the ascertainment of the exact facts impossible."

And see *Brown* v. *Bishop Trust Co.*, 44 Haw. 385.

As stated in *Smith* v. *Thompson's Administrator, supra*:

"* * * The application of this equitable doctrine * * * does not require the conviction of the Court against the original justice of the claim, or of any other specific ground of defence, but its belief that under the circumstances of the case, it is too late to ascertain the merits of the controversy." (p. 54.)

It is argued that laches will not avail as a defense unless the delay has worked disadvantage to the defendant. However, specific evidence of prejudice is not required when the case is one in which the evidence has become so obscured that no conclusion can be safely arrived at. *Lewis* v. *Bowman, Evans* v. *Steele, supra.*

It further is argued that plaintiff had no actual knowledge of the additional mortgages placed on the property until after Alice's death. He learned about them in 1938 subsequent to payment by him of all the mortgages. But he had reason to know that the originally contemplated $1400 mortgage had been paid off by 1935. It is reason to know of the breach, not actual knowledge, which is pertinent to the question whether plaintiff slept on his rights. *Brown* v. *Bishop Trust Co., supra;* see also *Ulrich* v. *Hite,* 35 Haw. 158, 184; *In re Nelson,* 26 Haw. 809, 820; 30 C.J.S., *Equity,* § 128b.

As testified by William, he told Alice in 1933 that he was sure he had paid up the mortgage already. Alice

referred him to Union Trust Company, which refused him information saying it was a private affair. Apparently William dropped the matter. By simple arithmetic, disregarding the reduction in the amount of interest as the principal was reduced, William could have determined that the full sum of $1400, which he understood to be the amount of the mortgage, must have been paid with 8% interest by the summer of 1935. He could have obtained information as to the calculation of the period required to amortize a mortgage of $1400, even if information as to the specific mortgage was refused him, and then would have learned that a mortgage in the amount contemplated by him should have been paid off in 1934. Thus plaintiff's laches began in 1934 or 1935. Alice did not die until January, 1937. When she was on her deathbed he belatedly and hesitantly reminded her about the property. His excuse for not having pressed her earlier was that he had not finished paying the mortgage, but he easily could have determined that he had.

On February 12, 1937, William petitioned for letters of administration. Notice was published under the statute and William was appointed in April, 1937. Defendant, husband of the deceased, was entitled to priority in appointment as administrator unless satisfactory cause was shown for disregarding the order of priority. R.L.H. 1955, § 317-13; *Estate of Meyer,* 25 Haw. 613, reh'g den. 25 Haw. 667. No cause was shown in the petition.

Defendant did not hear of William's petition until a friend told him of it three or four months later. In 1938, he retained an attorney who filed an appearance in the probate proceeding December 14, 1938. Defendant did nothing more about the probate until 1956. Then he retained his present attorney, his former attorney having died, and took steps in the probate which led to William's removal.

The numerous steps in the probate proceeding since the controversy came to life in 1956 need not be detailed here. Inconsistency of position, much argued by defendant, is not confined to plaintiff alone. However, it is the period prior to 1956 that is decisive in connection with the defense of laches and we confine our attention to that period.

Plaintiff argues that he has been in possession all this time and that one in possession is not guilty of laches, citing *United States* v. *New Orleans Pacific Ry.*, 248 U.S. 507, and *Bradley* v. *Lightcap*, 195 U.S. 1, which hold that one in peaceable possession under an equitable claim is not subject to a charge of laches by reason of mere delay in resorting to the equity court. Plaintiff also cites *First National Bank* v. *McIntosh*, 201 Ala. 649, 79 So. 121, in which a grantor still in possession sued for cancellation of a deed for failure of compliance with a condition subsequent contained in the deed, and the court affirmed the overruling of a demurrer asserting laches, which was presented by a bank claiming as mortgagee of the grantee. In each of these cases the possession was in pursuit of the right.

Laches is lack of diligence (*Houghtailing* v. *De La Nux*, 25 Haw. 438, aff'd 269 Fed. 751; *Bertelmann* v. *Lucas*, 35 Haw. 335, 345), hence may be negatived by possession which asserts the right under the contract sought to be enforced. As stated in Pomeroy, *Specific Performance of Contracts*, 3d ed., § 404:

"* * * the rule prevails in equity as in law, that while the plaintiff is in possession under an assertion and exercise of right, the lapse of time does not prejudice his remedial right." (p. 856.)

In Fry, *Specific Performance of Contracts*, 3d ed., § 1082, the rule is stated as follows:

"But possession, to save a purchaser from the

usual consequence of delay, must be possession under the contract sought to be enforced, and the vendor must have known or have been bound to know that the purchaser claimed to be in possession under the contract." (p. 531.)

Defendant disputes that plaintiff's possession was at any time referable to the contract. Intertwined here is the issue as to whether the proof was sufficient to take the case out of the Statute of Frauds. See *Rose* v. *Parker*, 4 Haw. 593, 599-600; *Vierra* v. *Ropert*, 10 Haw. 294, 301, reh'g den. 10 Haw. 343; 49 Am. Jur., *Statute of Frauds*, §§ 429, 440, 441, 449-450, 456, *cf*. § 463; 24 Am. Jur., *Gifts*, § 68, *supra*. For present purposes it is sufficient to note that plaintiff's possession during the period before his appointment as administrator does little to strengthen his proof of the contract, because the monthly payments made by him were in the same amount as the rent paid by the former tenants, and the improvements he made were to make the place habitable as distinguished from additions to the place.

Defendant argues that William having been appointed administrator, he became possessed of the property as administrator, that he was also a tenant, and that his "possession was not such as to give him immunity from the rule of laches." It is not necessary to decide whether William was in possession as tenant and administrator as asserted. It is sufficient that his possession does not meet the defense of laches.

The jurisdiction of the probate court attached to the property. William caused himself to be appointed administrator. By analogy to the statute of limitations (see *Kalakaua* v. *Keaweamahi*, 4 Haw. 577) there applies the rule that, generally speaking, an administrator will not be deemed to be asserting an adverse claim while he re-

mains in office as administrator. But if he has clearly and unequivocally repudiated the trust, and this has been brought home to the knowledge or notice of the heirs, then he may be deemed to have been claiming possession adversely. *Kalakaua* v. *Keaweamahi, supra.*

Thus William, by assuming a fiduciary position, in order for his possession to meet the defense of laches had to show that the heirs knew or had notice of his claim under the contract, though generally (*In re Bank's Estate,* 80 Mont. 159, 260 Pac. 128; *Robinson* v. *McDonald,* 11 Tex. 385; see also *Emele* v. *Williams,* 10 Haw. 123) a claim for specific performance is not the type of creditor's claim that has to be presented by the ordinary claimant.

In the petition for letters of administration William alleged that Alice "died seized and possessed of real and personal estate in said City and County consisting chiefly of a parcel of land in said City and County estimated to be worth about $2,500." However, the real property was not included in the inventory subsequently filed and plaintiff relies on that fact. As an administrator claiming property standing in the name of the decedent, William should have inventoried the property, at the same time asserting his right thereto. *In re Love's Estate,* 176 Tenn. 696, 145 S.W. 2d 778; *Simms* v. *Guess,* 52 Ill. App. 543; *Hartwig* v. *Flynn,* 79 Kan. 595, 100 Pac. 642; *Potter* v. *Titcomb,* 10 Me. 53, 64; *Buchser* v. *Buchser,* 72 Wash. 675, 131 Pac. 193, reh'g den. 132 Pac. 239; but see *Rosenfield* v. *Rosenfield,* 212 Ind. 120, 6 N.E. 2d 938; *State* v. *French,* 60 Conn. 478, 23 Atl. 153. However, if he had inventoried the property without assertion of his right that would not necessarily have estopped him from asserting his claim later. *Laudano* v. *Laudano,* 108 Conn. 37, 142 Atl. 407; *Scott* v. *Moffard,* 64 Ohio App. 457, 28 N.E. 2d 947; *In re Hamilton's Estate,* 182 Wash. 81, 45 P. 2d 36; *In re Galletto's Estate,* 75 Cal. App. 2d 481, 171

P. 2d 152 (D.C.A. 1st Dist.); *cf. Henshaw v. Gunter,* 169 Tenn. 305, 87 S.W. 2d 561.

As above noted, William's possession prior to Alice's death was of a doubtful character. His taking out of letters of administration on a petition which stated that the land was the chief property held by the decedent made it more so. During a period of nearly twenty years, no claim to a conveyance was made except in the privacy of the attorney-client relationship. The property remained on the tax assessment rolls in the name of the estate and William paid taxes after Alice's death without noting any individual claim to the property. He applied for and was allowed home exemption as an heir living on the property, not as sole owner. In the petition William named as heirs himself, the defendant, and one Victoria Laa, whose rights he now disputes. As an heir and tenant in common of the property William would have a fiduciary relationship to the other heirs, his cotenants, and this in itself would require that William bring home to the other heirs the knowledge or notice of his adverse claim. See *Peters v. Kupihea,* 39 Haw. 327, 330; *Kaia v. Kamaile,* 4 Haw. 352; *Jones v. Pooloa,* 11 Haw. 755; *Nahaolelua v. Kaaahu,* 10 Haw. 662; *Smith v. Hamakua Mill Co.,* 13 Haw. 716, 721; *Kalamakee v. Wharton,* 16 Haw. 228, 232; *Aiona v. Ponahawai Coffee Co.,* 20 Haw. 724, 727. Under all the circumstances, neither the possession enjoyed before Alice's death nor the omission of the property from the inventory was sufficient to bring home to the heirs the knowledge or notice of his adverse claim. *Cf. Anderson v. Shelton,* 92 N.W. 2d 166, 172-173 (N.D. 1958); *Kalakaua v. Keaweamahi,* 4 Haw. 571; *Kalakaua v. Keaweamahi,* 4 Haw. 577, *supra; Bradshaw v. Mayfield,* 18 Tex. 21.

In the decision below the court stated: "I am convinced that he [defendant] knew about the agreement between Alice and Poka." The only reason given for this

was that "I cannot accept his testimony as being true." Lack of knowledge does not import knowledge. The court stated in the decision: "Nani Holi's whole testimony indicated a complete lack of knowledge of the transaction which is the subject matter of this suit." Defendant may have acquiesced in William's free occupancy of the property without acquiescing in his claim of a right to a conveyance. There was no affirmative showing that defendant's conduct excused William's delay.

In 1950 William offered defendant $500 for his rights. That got defendant "burned up" but he did nothing about it until 1956. In 1950 William already had been sleeping on his rights for fifteen years. We do not consider this matter significant.

Our holding denies specific performance and sets aside the judgment appealed from, which decreed plaintiff to be the rightful owner and entitled to a deed of the premises. Defendant has asked that the case be dismissed. Because dismissal would foreclose other relief, if any be available under the general prayer of the complaint, we do not so order.

Reversed and remanded for further proceedings consistent with this opinion.

*Brahan Houston* for appellant.

*Spark M. Matsunaga* (*Matsunaga and Oki* on the briefs) for appellee.