CITY AND COUNTY OF HONOLULU, a municipal corporation, Plaintiff-Appellant, Cross Appellee *v.* NORA SWANZY BENNETT, et al., Defendants-Appellees, Cross Appellees, and ABRAHAM K. McAULTON, Intervenor-Appellee, Cross Appellant

NO. 5507

AUGUST 9, 1976

RICHARDSON, C.J., KOBAYASHI, OGATA, MENOR, JJ., and LANHAM, CIRCUIT JUDGE, by reason of vacancy

196

OPINION OF THE COURT BY RICHARDSON, C.J.

In this action the City and County of Honolulu (hereinafter, the City) has condemned for park purposes the uninhabited offshore island of Mokoli'i and two nearby beach front parcels in the vicinity of Kualoa Point, Oahu. The main parcel, designated as Parcel 2, contains approximately 145 acres. Kualoa Point is at a corner of this parcel. The other parcel, designated as Parcel 9, contains approximately 2.7 acres and adjoins a portion of Parcel 2. Mokoli'i Island[1] lies about 1600 feet offshore from Kualoa Point and comprises approximately 4 acres.

---

[1] Mokoli'i is commonly known as "Chinaman's Hat", apparently because its silhouette resembles the pointed hat worn in the nineteenth century by immigrant Chinese laborers.

The two separate appeals in this case involve the questions of title to Mokoli'i Island and Parcel 9 immediately prior to condemnation. With regard to Mokoli'i Island, the City appeals from a directed verdict that title to the island was in appellees Bennett et al. (hereinafter, the Bennetts), as opposed to the City's contention that the island was State property.[2] With regard to Parcel 9, appellant McAulton contests a jury verdict that sole title to the parcel was in the Bennetts, contrary to McAulton's claim that he had title to an undivided one-half interest. Parcel 2 does not directly figure in these appeals; it is undisputed now that the great bulk of the parcel belonged solely to the Bennetts and that the small remaining segment, an old kuleana plot, belonged to one Joseph Lima.

## I. MOKOLI'I ISLAND

The directed verdict that title to Mokoli'i Island was in the

---

[2] The City did not bring in the State as a defendant. If the State were found to be the owner of the island, the City would presumably be powerless to condemn it. See HRS §§ 101-51 and 171-2, excluding "public lands" from "public property" condemnable under §§ 101-51 through 101-54.

Bennetts logically depends on the theory that a deed from King Kamehameha III in 1850 conveyed the island to the Bennetts' undisputed predecessor in interest, Gerrit P. Judd. It is undisputed that this deed effectively conveyed to Judd the bulk of the ahupua'a of Kualoa I and Kualoa II (hereinafter collectively referred to as Kualoa).[3] The Bennetts argue that the deed manifests a clear intent to convey Mokoli'i as a part of Kualoa. The City contends, first, that whatever the deed intended, Kamehameha was powerless to convey the island to private parties, and, secondly, that even if Kamehameha had the power to convey it, the deed as properly construed does not manifest an intent to convey the island.

We consider first whether or not Kamehameha III had the power on November 20, 1850, the date of the deed to Gerrit Judd, to convey Mokoli'i to a private party. The City relies on a Privy Council resolution dated August 29, 1850, which the City interprets as preventing private ownership of offshore islands. The resolution and the Council minutes immediately preceding it state:

"Kekuanaoa on behalf of Victoria [Kamamalu], having asserted her right to participate in the Anchorage dues in certain places, the following Resolution was passed.

"RESOLVED that the rights of the King as Sovereign extend from high Water Mark to a Marine league to Seaward, and to all Navigable Straits and passages, among the Islands, and no private right can be sustained, except private rights of fishing, and of cutting Stone from the Rocks, as provided for and reserved by law."[4]

---

[3] The ahupua'a was a basic Hawaiian land division. Under the ancient land system, an ahupua'a

"was ruled by either a chief or a *konohiki* [an agent of the king or a chief]. The ideal *ahupuaa* extended from the sea to the mountains . . . . [T]he *ahupuaas* vary in size. Though the smaller *ahupuaas* contain only a hundred acres of land, the larger ones contain more than 100.000 acres." J. Chinen, *The Great Mahele* (1958) at 3.

[4] 3B Privy Council Records 791.

The City argues that, because Mokoli'i and other offshore islands are within the area extending "from high Water Mark to a Marine league to Seaward, . . . no private right can be sustained" with regard to such islands, except perhaps the right to quarry stone from them.

The City has introduced no evidence that the resolution addressed itself to the question of offshore islands. Rather, considering the reference in the council minutes to a dispute over the government's sharing of its anchorage fees with a private landlord (who apparently owned certain fisheries in which ships were being anchored), it is at least as likely that the resolution was intended to deal solely with rights of anchorage, navigation, fishing and coral quarrying[5] *in* or *under* the sea.

Furthermore, even if the Privy Council clearly intended to prevent private ownership of offshore islands, this court has held that Privy Council resolutions did not have the force of law. "[T]he privy council had no power to enact laws. The only power they had . . . was to advise the king." *Territory* v. *Liliuokalani,* 14 Haw. 88, 91 (1902) (ruling on the same resolution of August 29, 1850). "[T]he privy council was a part of the executive branch of the government with powers of an advisory nature . . . . At no time did the privy council possess legislative powers." *In re Title of Pa Pelekane*, 21 Haw. 175, 182 (1912).

The City's theory that there could be no valid conveyance of offshore islands to private parties is inconsistent with at least one land commission award previously noted by this court and a royal patent grant noted by the United States Supreme Court. In *State* v. *Hawaiian Dredging Co.*, 48 Haw. 152, 153, 397 P.2d 593, 596 (1964), this court referred to the land commission award of Kahaka'aulana Island in Keehi Lagoon, Oahu, to a private party, and we noted that the Territory of Hawaii had conceded in 1941 that the island was privately owned; while in *Damon* v. *Hawaii*, 194 U.S. 154, 160

---

[5] "[C]utting Stone from the Rocks" in the resolution apparently refers to the quarrying of coral from the reefs.

(1904), the Supreme Court indicated that three offshore islands had been included in the royal patent grant of the ahupua'a of Moanalua to a private party:

"This patent describes the ahupuaa by metes and bounds, and then the granting clause goes on: . . . 'The islands of Mokumoa, Mokuonini and Mokuoco [sic] are a part of Moanalua, and are included in the above area.'"[6]

The theory that only the government can own offshore islands is also contradicted by the following passage from a letter introduced into evidence by the Bennetts, dated August 17, 1937 and purportedly from R. D. King, Principal Cadastral Engineer (i.e., principal surveyor), to the [Territorial] Commissioner of Public Lands, in response to a request by the Commissioner for a study of the legal status of a particular sand islet in Kaneohe Bay:

"A notable instance where the government has granted offshore islands is that on the south coast of Oahu where three islands were included in the boundary certificate and Royal Patent . . . of the ahupuaa of Moanalua . . . . In the case of the crown ahupuaa of Kualoa, the island of Mokolii, just offshore from that land in Kaneohe bay, was specifically included in the deed of Kamehameha III to G. P. Judd . . . ; and in the case of the crown iliaina of Kawailoa, ahupuaa of Kailua, the island of Popoia in Kailua bay . . . was included in the boundary certificate of Kawailoa. Two cases involving offshore islands not specifically mentioned in the original titles, have recently come before the Land Court . . . .

"[A]ll the [above-mentioned] offshore islands are located within the sea fisheries which are appurtenant to their neighboring lands, and I think this was one of the factors the [Land] Court took into consideration in rendering its decision in favor of the applicant and against the government . . . ."

The probable existence of land commission awards,

---

[6] It seems that a typographical error in United States Reports caused Mokuoeo Island to be misspelled "Mokuoco".

boundary certificates, royal patents and Land Court decrees all purporting to award private ownership of offshore islands tends to support the Bennetts' position that offshore islands could validly be granted to private parties.

More fundamentally, the City's contention that Kamehameha III had no legal authority to convey offshore islands loses sight of the cornerstone proposition that the modern Hawaiian system of land ownership and all Hawaiian land titles proceed from Kamehameha III, the sovereign who instituted Hawaii's Great Mahele. As this court stated in *Carter v. Territory*, 14 Haw. 465, 470 (1902), *rev'd on other grounds*, 200 U.S. 255 (1906):

> "Kamehameha III, who ruled the Hawaiian Islands before there was any written laws or Constitution, as well as after the adoption of a written Constitution, was in the fullness of the common law phrase 'the universal lord and original proprietor of all lands in his kingdom.' He was the source of title. He could give and take from. His will was law . . . ."[7]

Although it is undoubtedly true that certain limitations on the powers of Kamehameha III were self-imposed during the course of his reign, such limitations would have to be clearly expressed and clearly applicable in order for us to find today that an act by that king was void. Because the City has failed to point to any constitutional provision or law depriving Kamehameha III of the power to grant offshore islands, this court finds that he did have such a power.

The City's second major argument is that, even if Kamehameha had the power to convey offshore islands, his deed to Judd does not manifest an intent to convey Mokoli'i. The Bennetts contend that the deed manifests a clear intent to convey the island. The dispute over Kamehameha's intent centers on the following passage. which immediately follows

---

[7] This is not to say that Kamehameha III owned the Hawaiian Islands as a private landowner. In the Constitution of 1840 promulgated by Kamehameha III it was recognized that Kamehameha I, who first conquered all the islands, held title to the islands not in a personal capacity but as head or sovereign of the people. *The Fundamental Law of Hawaii* (1904) at 3.

the deed's metes and bounds description of the mainland portion of Kualoa:

> "Then following along upper edge of Pali rock to end of first line run, Including an area of about 622 Acres more or less, and known as the lands of Kuloa first and second also the above described boundaries includes all the sea or fishing grounds adjoining both said lands and the Island called Mokoli."

The City construes the last clause of this passage as merely conveying fishing rights in that part of the sea which "adjoin[s] both said lands and the Island called Mokoli", *i.e.*, the City contends that "Mokoli" is mentioned merely as an aid in locating the fishing grounds conveyed. The Bennetts contend that "Mokoli" is an object of the verb "includes", so that the meaning of the passage is that "the above described boundaries *includes* . . . the . . . *fishing grounds* adjoining both said lands *and* the *Island called Mokoli*". (Emphasis added). We find that the disputed clause, considered solely by itself, is susceptible of both interpretations advanced. However, at the outset we note a common sense presumption that when a small, nearby offshore island is *expressly named* in an ambiguous clause of a Kamehameha grant whose language can easily and naturally be construed as conveying the island; where the grant conveys a sizeable ahupua'a; and the shoreline of that ahupua'a is only a fraction of a mile from the island[8] and is much closer than any other ahupua'a;[9] and the grant specifically conveys the appurtenant fishing grounds of the ahupua'a;[10] then, in the absence of other facts, it is more likely than not that the intent of the grant was to include the named island as a part of the ahupua'a.[11]

---

[8] Mokoli'i lies approximately 1600 feet offshore from the mainland.

[9] *Cf.* the map set out *supra.*

[10] It is a well established principle of Hawaiian property law that rights in specific offshore fishing grounds frequently attached to individual ahupua'a. Smith v. Laamea, 29 Haw. 750 (1927); Damon v. Hawaii, 194 U.S. 154 (1904).

[11] *Cf.* the statement in the royal patent grant of the ahupua'a of Moanalua that "'[t]he islands of Mokumoa, Mokuonini and Mokuo[e]o *are a part of* Moanalua.'" Damon v. Hawaii, *supra* at 160 (emphasis added).

This court finds that the trial court was correct in granting a directed verdict in accordance with the Bennetts' construction of the deed. The Bennetts introduced extensive, undisputed evidence strengthening the presumption that conveyance of the island was intended, while the City introduced evidence of only the slightest probative value to rebut the presumption.

The sole evidence supporting the City's construction of the deed is the Privy Council resolution discussed *supra*. The City argues that even if the resolution lacked the force of law, Kamehameha III probably would not have acted contrary to it, since his own Privy Council promulgated it. There would be merit to this argument, if the resolution was in fact intended to limit the ownership of offshore islands by private parties; but, as discussed *supra*, such an intent is speculative and unclear. Therefore, we find that the resolution does not substantially support the City's construction.

In contrast to the City's failure of evidence, the Bennetts produced evidence that the successors to the original parties to the deed have for many years mutually construed the deed to convey Mokoli'i. By direct testimony the Bennetts proved possession of the island, by themselves or their predecessors, under claim of exclusive title, since at least the 1930s. They proved payment of all Territorial and State taxes since at least 1933. They exhibited [Territorial] Senate Resolution No. 24 of 1931 which requested the Commissioner of Public Lands, with the assistance of the Attorney General and the Territorial Surveyor, to ascertain the status of the islands lying offshore from the northeast and east districts of Oahu, and they exhibited the Commissioner's reply, listing the islands in question and stating that "[a]ll of these islands, *except Mokolii*, are claimed by the Territory." (Emphasis added). Similarly, they introduced into evidence the Governor's Executive Order No. 532, dated May 7, 1932, which stated that "the Islands along the Northeast coast of Oahu . . . as listed" were to be set aside as a bird, animal and plant preservation. Mokoli'i was not included in the list of islands. The Bennetts introduced the letter, quoted *supra*, from the principal cadas-

tral engineer (principal surveyor) of the Territory to the Commissioner of Public Lands, dated August 17, 1937, which stated that "[i]n the case of the crown ahupua'a of Kualoa, the island of Mokolii, just offshore from that land . . . was specifically included in the deed of Kamehameha III to G. P. Judd . . . ." Even the City and County resolution authorizing condemnation of Mokoli'i, *i.e.*, Resolution No. 357 dated December 1, 1970, specifically stated that Mokoli'i is "a portion of the land conveyed by Kamehameha III to G. P. Judd by deed dated November 20, 1850 . . . ."

In *State* v. *Midkiff*, 49 Haw. 456, 492, 421 P.2d 550, 570 (1966), wherein the State and private parties had disputed the boundaries of a land commission award which had described the land solely by its ancient Hawaiian name, this court concluded that "[t]here has emerged a pattern of *construction by the parties* which tips the scale . . . ." (Emphasis added). In *State* v. *Hawaiian Dredging Co.*, 48 Haw. 152, 176, 397 P.2d 593, 607 (1964), which also involved a dispute between the State and private parties over the extent of an imprecise land commission award, this court held that "[i]f considered ambiguous, the construction given a deed by the parties to it will be given effect unless it contravenes some rule of law." In the instant case, although the evidence shows only construction by the successors to the original parties, the fact that G. P. Judd's successors and Kamehameha III successors, including the Territory and the City, have for many years mutually construed the deed as conveying Mokoli'i tends to prove that such construction is the correct one. Taking this evidence in conjunction with the presumption, articulated *supra*, that an island which is specifically named in a grant and which has a very close geographic relationship to the primary lands granted is probably included in the grant, this court finds that the evidence in this case allows but one inference, namely, that Kamehameha III intended to convey the island to Judd. We affirm the trial court's directed verdict that title to Mokoli'i was in the Bennetts.

## II. PARCEL 9

Appellant McAulton claims that he had an undivided one-half interest in Parcel 9, held in cotenancy with the Bennetts. The Bennetts claim that they were sole owners of the parcel.

It is undisputed that Parcel 9 is a portion of the ancient ahupua'a of Hakipu'u,[12] title to which was confirmed in Queen Kalama, widow of Kamehameha III, by Land Commission Award 4452, Apana 14. Queen Kalama died intestate in 1870.

At trial the Bennetts produced a paper chain of title commencing with a probate court order which purports to determine the heirs of Queen Kalama. Facially, this paper chain transmits Parcel 9 in its entirety to the Bennetts. The Bennetts' primary theory is that their paper chain is wholly valid, in contrast to McAulton's theory that the chain is valid only to the extent of a one-half interest. An alternate theory advanced by the Bennetts is that, even if the earliest documents in their chain of title merely conveyed a cotenancy interest, subsequent adverse possession by the Bennetts or their predecessors would have enlarged a partial interest into sole ownership. It is undisputed that the Bennetts and their predecessors have had sole possession of the parcel since 1880.

The Bennetts' first theory, that their paper chain of title is wholly valid, depends on the factual assumption that Charles Kana'ina, the Bennetts' predecessor in interest, was the sole heir of Queen Kalama.[13] McAulton contends that Kana'ina was only a coheir, on the theory that both Kana'ina and McAulton's alleged ancestor, George Naea, were uncles of Queen Kalama; so that when the Queen died intestate, title to

---

[12] As indicated by the map, *supra*, Hakipu'u and Kualoa were adjoining ahupua'a.

[13] The Bennetts introduced into evidence an "Order Approving . . . Final Distribution" issued by the Hawaii Supreme Court on August 28, 1871, which lists Kana'ina as Kalama's sole heir. However, the Bennetts do not contend that the order is res judicata as to McAulton. *See generally* Smith v. Hamakua Mill Co., 13 Haw. 245, 246-48 (1901), and Mossman v. Hawaiian Government, 10 Haw. 421, 423-433 (1896), discussing the limited effect of early Supreme Court probate orders.

Kahipu'u vested in Kana'ina and Naea's issue[14] as tenants in common. McAulton further claims to be the sole surviving descendant of Naea and apparently also argues that Naea's interest in Hakipu'u has neither been conveyed nor devised out of the direct line of descent from Naea to McAulton.

The jury returned a general verdict for the Bennetts. It therefore is impossible to know upon which of the Bennetts' two theories the jury relied, *i.e.*, whether the jurors believed that Kana'ina was the sole heir of Queen Kalama or, believing McAulton's genealogy, found for the Bennetts on the theory that adverse possession would have enlarged a cotenancy interest into sole ownership.

This court finds, for reasons explained below, that certain jury instructions by the court below on the subject of adverse possession were erroneous. "In jury trials, . . . an erroneous instruction is presumptively harmful and is 'ground for reversal unless it affirmatively appears from the whole record that it was not prejudicial.'" *Gelber* v. *Sheraton-Hawaii Corp.*, 49 Haw. 327, 330-31, 417 P.2d 638, 640 (1966). Because it is impossible to know whether or not the jurors relied on adverse possession in reaching their verdict, this court is unable to find that the errors below were harmless. Therefore we reverse and remand for a new trial on the issue of title to Parcel 9.

The erroneous instructions dealt with the issue of whether or not actual notice of an adverse claim must be received by a cotenant out of possession in order for adverse possession to begin running in favor of the cotenant who is in possession. This issue arises under HRS § 657-31 which provided, as of the date of condemnation in this case, that actions to recover possession of real property, or entries upon such property, must be made "within ten years after the right to bring the action first accrued."[15] Because each cotenant is entitled to possession of the entire cotenancy property, and because

---

[14] Naea predeceased Kalama, according to McAulton.

[15] As explained in n. 17, *infra*, the 1973 legislature extended the statutory period for adverse possession to 20 years.

each cotenant is said to enter on behalf of all cotenants, it has always been difficult to determine when the right of entry or action first accrues in cotenancy cases. In the instant case, the specific issue is the degree of notice, whether actual or constructive, which must be received by the cotenant out of possession before his right of entry or right of action is said to accrue.

McAulton requested a jury instruction that a cotenant claiming by adverse possession "must show, clearly, . . . that [the cotenant out of possession] had actual notice of the claim for adverse possession." The court refused this instruction and instead gave the instruction requested by the Bennetts: "Neither actual knowledge by the cotenant out of possession . . . nor actual notice . . . is required."

Although this court finds that neither party formulated a wholly accurate rule of law, we find that McAulton's formulation is closer to the correct rule.

In *Yin* v. *Midkiff*, 52 Haw. 537, 481 P.2d 109 (1971), this court laid down a requirement of actual notice or actual knowledge when a cotenant claims adversely against a blood-related cotenant. In *Yin* we acknowledged that even in ordinary cases of adverse possession between unrelated cotenants, "traditionally courts have [required proof of] . . . knowledge or notice of the hostile holding *brought home* to the cotenant or cotenants out of possession" 52 Haw. at 540, 481 P.2d at 111 (emphasis added); while in cases where the cotenants are closely related by blood,

> "the burden of the cotenant claiming adversely is intensified . . . . This increased burden usually requires the additional element of 'actual knowledge' of the adverse possession, rather than mere circumstances putting the possessor's cotenants on notice." 52 Haw. at 540, 481 P.2d at 112.

> "There must be some additional element of 'actual knowledge' of the adverse possession. All that we have here are circumstances that might possibly put the possessor's cotenants on notice of the adverse claim. This does not amount to notice of ouster or as the *Hamakua Mill* case

. . . phrases it, 'bringing it home' to the ousted cotenant."
52 Haw. at 547, 481 P.2d at 115.

Although the *Yin* requirement of actual knowledge is arguably applicable only when cotenants are blood-related, we interpret *Yin* more broadly. In general, we approach the issue of notice in a spirit opposed to the unduly facile acquisition of title by adverse possession. We take judicial notice that a critical attitude towards over-generous rules of adverse possession has manifested itself recently in law commentaries[16] and legislative activity.[17] Moreover, we read *Yin* in conjunction with *Poka* v. *Holi*, 44 Haw. 464, 481, 357 P.2d 100, 110 (1960), wherein this court impliedly adopted the rule, well established in a number of other jurisdictions,[18] that a tenant in common shares a general *fiduciary relationship* with his cotenants, which relationship may require the tenant in pos-

---

[16] *See, e.g.*, Neill Levy, *Native Hawaiian Land Rights*, 63 Calif. L. Rev. 848, 869-70 (1975), implicitly criticizing the tendency of older Hawaii cases to favor adverse possession. *See also* J. C. W. Wylie, *Adverse Possession: An Ailing Concept?* 16 Northern Ireland Legal Quarterly 467, 489 (1965), concluding that adverse possession may be "a product of an age of violence and self-help that has outlived its usefulness and has no place in a modern legal system." *And see* M. Town & W. Yuen, *Public Access to Beaches in Hawaii*, 10 Haw. Bar Jour. 5, 21 (1973), critically finding that "[a]dverse possession has historically been used in Hawaii by the rich . . . against the poor."
  On the other hand, Hawaii's Torrens system of land registration has, ever since its inception in 1903, flatly banned adverse possession against registered land. HRS § 501-87, derived from S.L.H. 1903, c. 56.

[17] In 1973, Hawaii extended the statutory period for adverse possession from 10 years to 20 years. S.L.H. 1973, c. 26 § 4, amending HRS § 657-31. In 1973, the legislature also passed a bill which would have required *good faith* by *all* adverse possessors. H.B. No. 15. explained in House Journal 1973 Reg. Session at 528-29. However, the bill was vetoed by the Governor. Senate Jour. 1973, Reg. Session at 597-98.

[18] *See, e.g.*, Hendrix v. Hendrix, 256 Ark. 289, 293, 506 S.W.2d 848, 851 (1974) ("We have long held that between tenants-in-common there is a fiduciary relationship . . . "); Aaron v. Puccinelli, 121 Cal. App. 2d 675, 677, 264 P.2d 152, 154 (1953) ("As cotenants, each bore to his other cotenants a fiduciary relationship"); Webster v. Knop, 6 Utah 2d 273, 312 P.2d 557, 560 (1957) (" 'The usual rule [is]. . . that a fiduciary relationship exists between tenants in common . . . ' "); Rex Oil Refining, Inc. v. Shirvan, 443 P.2d 82, 87 (Okla. 1968) (Cotenants "stand in a relation to each other of mutual trust and confidence . . ."); Smith v. Smith, 266 Ala. 118, 121, 94 So. 2d 863, 865 (1957) ("Tenants in common are in a confidential relationship to each other by operation of law . . .").

session to give his cotenants actual notice of an adverse claim:

> "[A]n heir and tenant in common of the property . . . would have a fiduciary relationship to the other heirs, his cotenants, and this in itself would require that [the cotenant in possession] *bring home* to the other heirs the *knowledge* or *notice* of the adverse claim." 44 Haw. at 481 (emphasis added).

Although *Poka* did not specifically deal with adverse possession, but rather, determined whether a cotenant in possession was barred by laches for tardily notifying his cotenants of his contract claim to sole ownership of the cotenancy property, *Poka* impliedly states that there is a fiduciary relationship between cotenants and that such relationship may require a notification (or "bringing home") to the cotenants of an adverse claim.

Following in the line of *Yin* and *Poka*, we lay down in this case the rule that, because of the general fiduciary relationship between cotenants, a tenant in common claiming by adverse possession must prove that he acted in *good faith* towards the cotenants during the statutory period. In most circumstances, this requirement of good faith will in turn mandate that the tenant claiming adversely must *actually notify* his cotenants that he is claiming against them. In the following exceptional circumstances, however, good faith is satisfied by less than actual notice: where the tenant in possession has *no reason to suspect* that a cotenancy exists; or where the tenant in possession makes a *good faith, reasonable effort to notify* the cotenants but is unable to locate them; or where the tenants out of possession already have *actual knowledge* that the tenant in possession is claiming adversely to their interests. In these limited circumstances, the notice

requirement will be satisfied by constructive notice and "open and notorious possession".[19]

On remand of the instant case, assuming first that the jury believes McAulton's genealogy and that it finds that the other elements of adverse possession have been satisfied (including, of course, the element of "open and notorious possession"), it will be the jury's task to decide whether or not the Bennetts or their predecessors exercised good faith with respect to their adverse claim.

Upon review of cases from other jurisdictions and of *Smith* v. *Hamakua Mill Co.*, 13 Haw. 716, 720-23 (1901), and *Pebia* v. *Hamakua Mill Co.*, 30 Haw. 100, 102-03 (1927), we note that sometimes a cotenant in possession will claim that, during the statutory period, he was ignorant of the cotenancy and didn't even suspect that a cotenancy might exist. In the instant case, the Bennetts appear to argue that, if there was a cotenancy, they and their predecessors were totally ignorant of it, and therefore they had no duty to attempt to notify their cotenants of the Bennetts' claim to sole ownership. Ignorance, however, is not necessarily good faith. Where a cotenant claims adversely, the standard of good faith includes an objective requirement of *reasonableness*, in addition to a sub-

---

[19] Compare the reasoning in *Poka* v. *Holi, supra,* wherein this court found that the fiduciary relationship between cotenants "in itself would require that [the cotenant in possession] bring home to the other heirs the knowledge or notice of the adverse claim." 44 Haw. at 481.

*See also* the following discussions of the requirement of knowledge or notice:

"The doctrine of adverse possession vigorously . . . protects the interest of out-of-possession cotenants . . . largely through the fiduciary relationship which it has imposed among cotenants. It is this relationship which results in the necessity of ouster or other disclaimer as a prerequisite to the running of the statute of limitations, in order that the cotenants will know of an adverse claim by a fellow cotenant. . . .

"[T]he requirement of ouster exists to *insure . . . that notice of adverse claim will be communicated* to the absent cotenant . . . ." Comment, *Adverse Possession Against Tenants in Common in Tennessee,* 37 Tenn. L. Rev. 776, 793-94 and 794, n. 86 (1970) (emphasis added).

"In order for the possession of the disseisor [*i.e.,* the cotenant in possession] to be adverse to his cotenants they *must have a knowledge* of their rights and of his assertion of adverse title." 5 Thompson, Real Property (1957 Repl.) § 2556 (emphasis added).

jective requirement that the claimant believe himself to be the sole owner. Thus, as stated *supra,* in order to meet the good faith standard, the Bennetts must prove either (1) that they or their predecessors gave *actual notice* to McAulton or his predecessors that possession was adverse to them, or (2) that one of the exceptional circumstances enumerated *supra* eliminated the requirement of actual notice: *i.e.,* that there had been *no reason* for the tenants in possession (the Bennetts or predecessors) to suspect the existence or a cotenancy; *or,* if they had suspected a cotenancy, that they made a good faith, *reasonable* effort to inform the tenants out of possession that the land was claimed adversely to them; *or* that the tenants out of possession already had actual knowledge, from other sources, that the land was being claimed adversely to them.[20] Whether or not the Bennetts *reasonably* believed that there was no cotenancy, or, if they did suspect a cotenancy, whether or not they made *reasonable* efforts to notify their cotenants, would be questions for the trier of fact, to be decided in light of all the facts and circumstances of the case. The existence or nonexistence of color of title is one factor for the jury to consider in evaluating whether a party in possession reasonably believed himself to be sole owner. On the other hand, evidence that the cotenant in possession knew or ought to have known that there existed a cotenancy, together with evidence that the party in possession did not attempt to notify the cotenants of his claim to sole ownership would go towards justifying a finding of bad faith, assuming that the cotenants did not already have actual knowledge of the adverse claim.

McAulton contends as a separate ground of error that the trial court improperly refused certain proferred exhibits. We

---

[20] *Cf.* C.J.S., *Tenancy in Common,* § 37: "It has been held that title is acquired by . . . adverse possession . . . under a claim of exclusive title without knowledge *or reason to know* of another's claim to be a tenant in common." (Emphasis added).

On the other hand, if the cotenant in possession does have reason to believe that others may be entitled to an interest in the property, and if they do not already have actual knowledge that he is claiming adversely to them, good faith will require him to make reasonable efforts to notify them before adverse possession begins running against them.

find no error. The exhibits, being copies of old newspaper articles about a dispute over a power of attorney given by Queen Kalama, appear to be of minimal relevance, at best, in determining (1) whether Kana'ina was the sole heir of Kalama or (2) whether the Bennetts' predecessors reasonably believed that they were sole owners and that no third party had a colorable claim to an interest in the property. Unless a closer, less speculative connection with material issues can be demonstrated on remand, the exhibits should be denied admission.

We suggest, but do not order, that on remand it would be wise for the court to require a special verdict on the issue of genealogy.

We affirm the award of compensation to the Bennetts for the taking of Mokoli'i Island. We reverse the award of sole compensation to the Bennetts for the taking of Parcel 9 and remand for a determination of whether or not McAulton is entitled to half of the amount awarded.

*Richard K. Sharpless*, Corporation Counsel, and *Kenneth Nam*, Deputy Corporation Counsel, for Plaintiff-Appellant, Cross-Appellee.

*Robert B. Bunn (Cades Schutte Fleming & Wright*, of counsel) for Defendants-Appellees, Cross-Appellees.

*Frank K. H. Kim (C. Duane Carlsmith* with him on the briefs) for Intervenor-Appellee, Cross-Appellant.