NO. 94-121

IN THE SUPREME COURT OF THE STATE OF MONTANA

1994

Y A BAR LIVESTOCK COMPANY,

    Plaintiff and Respondent,

  v.

MILES HARKNESS, et al.,

    Defendants and Appellants.

FILED

DEC 2 3 1994

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:   District Court of the Fifth Judicial District,
In and for the County of Beaverhead,
The Honorable Frank M. Davis, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

    Stuart R. Whitehair, Bozeman, Montana

    For Respondent:

    Carl M. Davis, Schulz, Davis & Warren,
Dillon, Montana

Submitted:  November 15, 1994

Decided:  December 23, 1994

Filed:

Chief Justice J. A. Turnage delivered the Opinion of the Court.

Miles Harkness, Max Harkness, Leila Dallas, Evelyn Erickson, Doris Haws, Milton Harkness, Colleen Rasmussen, Stacy Turner, Nancy Goodrow, Wade Draper, Amy Dean Raymond, Richard Wayne Harkness, Dorothy Lee Harkness Messick, Robert Earl Harkness and Gale Harkness (the heirs) appeal the decision of the Fifth Judicial District Court, Beaverhead County, quieting title to certain real property located in Beaverhead County to YA Bar Livestock Company (YA Bar). We reverse.

The sole issue is whether the District Court erred in determining that YA Bar had adversely possessed the land of its cotenants.

In order to fully understand the issue raised on appeal, a review of the historical and procedural background is necessary. All parties to this litigation, including the heirs, the current shareholders of YA Bar, and the predecessors in interest to YA Bar are descendants of Ernest I. and Arabina Harkness. Ernest I. and Arabina had six children: Ernest B. Harkness, Guy L. Harkness, Ross A. Harkness, Earl D. Harkness, Bessie (Harkness) Lewis and Jessie (Harkness) Jensen. In 1931 Earl D. Harkness homesteaded and patented 448.22 acres of land located in Beaverhead County, Montana (S1/2SW1/4 Section 3; Lots 1 & 2, S1/2NE1/4, N1/2SE1/4, SE1/4SE1/4 Section 4; NW1/4NE1/4, NE1/4NW1/4--Section 10, Township 14 South, Range 10 West, M.P.M.). In 1936 Earl conveyed this land to his father, Ernest I. Harkness. Three years before, in 1933, Ernest I. had sold his ranch, which consisted of various lands in the same

2

general vicinity as the 448.22 acre parcel, to his eldest son Ernest B. Harkness. Earl and Ernest I. moved to Idaho and did not return to Montana. In 1944 Ernest I. Harkness died. His wife, Arabina, died in 1946. The 448.22 acres in question were included in Arabina's estate at the time of her death. Ernest B. was appointed executor of Arabina's estate pursuant to the terms of her will. Arabina's will was admitted to probate in Idaho and in Beaverhead County, Montana. Arabina was preceded in death by one of her children, Earl. She was survived by her five remaining children: Ernest B., Guy, Ross, Bessie, Jessie, and Earl's six children: Amy (Harkness) Raymond, Richard Harkness, Robert Harkness, Dorothy (Harkness) Messick, Melvin Harkness, and Miles Harkness. At the time of Arabina's death, the Harkness family tree was as follows:

HARKNESS FAMILY TREE



**As** previously stated, the 448.22 acres in question were included in Arabina's estate. The Inventory and Appraisement and the Petition for Final Settlement and Distribution of Arabina's estate filed for by Ernest B. also included this parcel, except that approximately 40 acres was omitted from the legal description

3

of the parcel in these two documents (NE1/4NW1/4 Section 10, Township 14 South, Range 10 West, M.P.M., Beaverhead County, Montana).

Ernest B. sought to acquire title to the 448.22 acres, as he was the sole remaining Harkness living in Montana and the parcel in question was compatible with the ranch land he had purchased from his father in 1933. Ernest B. received quitclaim deeds from his living brothers and sisters: Ross, Guy, Bessie, and Jessie. However, the quitclaim deeds also omitted the 40 acres from the legal description. Earl's six children did not quitclaim their interest in the land to Ernest B.

The District Court, in conformity with the petition of Ernest B., ordered distribution of Arabina's estate. The court distributed a 5/6 interest in the parcel to Ernest B. and a 1/6 interest to Earl's six children (1/36 per child). This Final Settlement and Distribution again omitted the 40 acre parcel. All heirs therefore took their respective share of the omitted 40 acre parcel pursuant to the "any and all other property not now known or hereafter discovered" clause of Arabina's will.

The net result from the above transactions left the title to the land following Arabina's death and the probate of her will as follows:

```
408.22 acres (448.22 acre parcel minus the omitted 40 acres)
    5/6   Ernest B. Harkness
    1/6   children of Earl Harkness (1/36 for each: Amy,
          Richard, Dorothy, Robert, Melvin and Miles)

40 acres
    1/6   Ernest B. Harkness
    1/6   Ross Harkness
```

4

```
1/6   Guy Harkness
1/6   Bessie (Harkness) Lewis
1/6   Jessie (Harkness) Jensen
1/6   children of Earl Harkness (1/36 for each: Amy,
      Richard, Dorothy, Robert, Melvin and Miles)
```

Ernest B. received a 5/6 interest in the 408.22 acre parcel pursuant to the quitclaim deeds from his four siblings and pursuant to his petition for distribution of Arabina's estate. He received a 1/6 interest in the 40 acre parcel pursuant to the "any and all other property clause" of Arabina's will.

The six children of Earl Harkness received a 1/6 (1/36 per child) interest in the entire 448.22 acre parcel. Each child received a 1/36 interest, their respective 1/6 interest in their deceased father's 1/6 interest, of the 408.22 acre parcel pursuant to the distribution of Arabina's estate. They each likewise received a similar 1/36 interest in the omitted 40 acres pursuant to the "any and all other property clause" of Arabina's will.

The remaining offspring of Arabina each received a 1/6 interest in the omitted 40 acres pursuant to the "any and all other property clause" of Arabina's will. Jessie (Harkness) Jensen, the heirs of Ross Harkness, and the heirs of Bessie (Harkness) Lewis failed to appear in the quiet title action and default was entered against them. The heirs of Guy Harkness are parties to this action and seek to maintain their respective share of Guy Harkness's 1/6 interest in the omitted 40 acres.

In 1950 Ernest B. Harkness formed YA Bar Livestock Company. Ernest B. and his wife, Ruth, conveyed all their ranch property to the corporation. Included in this conveyance was the disputed

448.22 acres. YA Bar has used the 448.22 acres extensively in its ranching operation. The parcel is integrated into the other deeded and leased lands operated by YA Bar. The ranch, including the parcel in question, has been mortgaged six times. YA Bar has leased mineral rights and granted easements over the 448.22 acres without the knowledge or consent of the heirs. YA Bar has paid all taxes levied on the parcel and received all rents and profits as if it was the sole owner of the land.

In 1987, Ernest B. Harkness died. The current shareholders of YA Bar are Ernest B.'s son, Bernard Harkness; Bernard's wife, Jean Harkness; Ernest B.'s daughter, Bonnie (Harkness) McNich; and her husband, R.M. McNich. YA Bar found the property unmarketable when a title commitment listed the heirs' interest in the 448.22 acres. YA Bar sought quitclaim deeds from the heirs to clear title to the parcel. The heirs refused to grant YA Bar quitclaim deeds.

YA Bar instituted this quiet title action, claiming it had adversely possessed the land of its cotenants. The District Court agreed and quieted titled to YA Bar. The heirs appeal from the District Court's decision.

Did the District Court err in determining that YA Bar had adversely possessed the land of its cotenants?

This Court reviews the findings of a trial court sitting without a jury to determine if the court's findings are clearly erroneous. Rule 52(a), M.R.Civ.P. A district court's findings are clearly erroneous if they are not supported by substantial credible

6

evidence, if the trial court has misapprehended the effect of the evidence, or if a review of the record leaves this Court with the definite and firm conviction that a mistake has been committed. Interstate Prod. Credit Ass'n v. DeSaye (1991), 250 Mont. 320, 323, 820 P.2d 1285, 1287.

For a claim of adverse possession to succeed, the claimant must prove that the property was claimed under color of title or by actual, visible, exclusive, hostile and continuous possession for the full statutory period of five years. In addition, the claimant must have paid the taxes on the property throughout the entire statutory period; Smithers v. Hagerman (1990), 244 Mont. 182, 189, 797 P.2d 177, 182.

Section 70-19-404, MCA, governs adverse possession against a landowner who has legal title to the property in question. This section states:

> [T]he person establishing a legal title to the property is presumed to have been possessed thereof within the time required by law, and the occupation of the property by any other person is deemed to have been under and in subordination to the legal title unless it appears that the property has been held and possessed adversely to such legal title for 5 years before the commencement of the action.

Section 70-19-404, MCA. The heirs gained a legal interest in the property following the probate of Arabina's estate; therefore, any use of the property by YA Bar is presumed to be subordinate to the heirs' interests

Additionally, adverse possession by one cotenant against another cotenant requires an even higher standard than adverse possession against a stranger. To adversely possess against a

7

cotenant, the claimant must meet the above requirements and also "oust" the cotenant from the property. This additional requirement is necessary because any possession of land by one cotenant is considered to be consistent with and in recognition of the cotenancy. Fitschen Bros. Comm. Co. v. Noyes' Estate (1926), 76 Mont. 175, 246 P. 773. In Fitschen, this Court explained this concept as follows:

> When a cotenant . . enters on the common land he is exercising a right which his title gives him; and his resulting possession is presumed to be consistent with his assumed title, and therefore to be the possession of his cotenants and himself. But the doctrine has been long since held . . that one tenant in common may so enter and hold as to render the entry and possession adverse, and amount to an ouster of a cotenant. And so, where once it appears that the party occupying the premises holds not in recognition of, but in hostility to, the rights of his cotenants, his possession ceases to amount to constructive possession by them, becomes adverse, and, if maintained for the period provided for by the statute of limitations, will vest in the possessor a sole title by adverse possession to the premises.

Fitschen, 246 P. at 779.

A cotenant must give his or her fellow cotenants notice that possession of the land is no longer consistent with the cotenancy and that he or she asserts a claim as sole owner of the property. In Fitschen this Court further stated:

> While it is true that actual ouster of the cotenants must appear, this does not necessarily imply an actual physical ouster, but it is sufficient if the grantee claims exclusive ownership and by his conduct denies the right of others to any interest in the property.

Fitschen, 246 P. at 779. The theory of adverse possession against a cotenant was again explored by this Court in LeVasseur v. Roullman (1933), 93 Mont. 552, 20 P.2d 250. In further discussing

8

the difficult hurdle a cotenant must clear to adversely possess against a fellow cotenant, this Court stated:

> All acts done by a cotenant and relating to or affecting the common property, are presumed to have been done by him for the common benefit of himself and the others. The relation between him and the other owners is always supposed to be amicable rather than hostile; and his acts are therefore regarded as being in subordination to the title of all the tenants, for by so regarding them they may be made to promote the interests of all. . . . [P]ossession of a cotenant . . . is the possession of all the cotenants.
>
> However, one tenant in common may oust his cotenant and make his possession adverse. But, as prima facie the possession of every cotenant is presumed to be by virtue of his title, and not in hostility to the rights of his cotenants . . In order to sustain the claim that he has obtained title by adverse possession, the claimant must show that his cotenants had sufficient notice of his exclusive and hostile claim.
>
> . . The knowledge must be either brought home to him, or the occupier must make his possession so visibly hostile, notorious, and adverse, as to justify an inference of knowledge on the part of the tenant sought to be ousted . . .

LeVasseur, 20 P.2d at 252.

Thus, to adversely possess against a cotenant, the claimant must oust the fellow cotenants. A cotenant can oust a fellow cotenant by giving the fellow cotenant notice that he or she is claiming an interest hostile and adverse to the fellow cotenant's interest.

YA Bar has failed to meet this standard. The heirs claim that they were unaware of their interest in the 448.22 acre parcel until they received quitclaim deeds from YA Bar in 1991. YA Bar does not claim that the heirs knew of the cotenancy nor did it present any

9

evidence which would show how the heirs would have received such notice. YA Bar did not establish that the children of Earl Harkness received any notice of their inheritance from their grandmother, Arabina. YA Bar did not show that Earl's children had ever received deeds to the property or that YA Bar had presented them with quitclaim deeds in 1946 as it did the other heirs. YA Bar did not claim to have informed the heirs of their interest until the issuance of the quitclaim deeds in 1991. We conclude that YA Bar's use of the 448.22 acres in conjunction with its other ranch lands did not give the heirs sufficient notice to constitute an "ouster" as discussed in Fitschen and LeVasseur.

YA Bar next argues that when cotenants are unaware of the existence of a cotenancy, they are in essence "strangers" and therefore only the general elements of adverse possession are required. YA Bar relies on two cases, Nicholas v. Cousin (Wash. Ct. App. 1969), 459 P.2d 970, and City and County of Honolulu v. Bennett (Haw. 1976), 552 P.2d 1380, for this proposition

In Nicholas, the Washington Court of Appeals found that a cotenancy existed, although neither party was aware of it. The court carved out an exception for adverse possession between non-knowing cotenants, stating:

> When the cotenant in possession of land is a non-knowing cotenant, i.e., one who is unaware of the existence of the cotenancy, subjectively he is a stranger to the title held by the non-possessing cotenant; and, therefore, may possess the requisite intent of a "stranger" for adverse possession. If he does possess the "stranger's" intent, and his conduct complies with the general statutory requirements for ouster by adverse possession, his claim is perfected.

10

> A non-possessing cotenant who is unaware of his
> position as a cotenant is in the same position as any
> other member of the public at large. Thus, when a person
> claims sole and exclusive ownership of property and the
> non-possessing cotenant has notice of this claim, actual
> or constructive, he is bound in the same way as those
> who, by mistake of fact or law, are ignorant of their
> interest and have allowed strangers to claim adversely to
> their property rights.

Nicholas, 459 P.2d at 975. Thus, under Washington law, a non-knowing cotenant can adversely possess against a fellow non-knowing cotenant just as he or she would against any other member of society, by satisfying the general statutory elements for adverse possession.

In Bennett the Supreme Court of Hawaii created another, although narrower, exception for adverse possession by a non-knowing cotenant. That court ruled that if a cotenant acting in good faith has no reason to believe that a cotenancy exists, then actual notice to the fellow cotenant is not required. Bennett, 552 P.2d at 1391.

However, it is unnecessary for us to either adopt or reject the analysis of Nicholas or Bennett because under either theory YA Bar would be charged with knowledge of the cotenancy. Nicholas and Bennett both rely on the claimant being a non-knowing cotenant. Since we conclude, as discussed below, that YA Bar must be charged with knowledge of the cotenancies, Nicholas and Bennett are inapplicable.

Ernest B. Harkness, the predecessor in interest, founder, and 37 year president of YA Bar was the executor of Arabina's estate.

11

Ernest B. therefore knew how Arabina's estate was distributed. The Final Settlement and Distribution of Arabina's estate granted a 1/36 interest in the 408.22 acre parcel to each of Earl Harkness's six children. Ernest B., as executor of Arabina's estate, filed the Final Settlement and Distribution which resulted in the creation of those interests. Ernest B. requested and received quitclaim deeds to the 408.22 acre parcel from his four remaining siblings. Ernest B. did not, however, receive quitclaim deeds from Earl's six children. These facts clearly establish that Ernest B. knew of the heirs' interests in the 408.22 acre parcel.

YA Bar **claims** it was a non-knowing cotenant and held the entire parcel as sole owner under "color of title." The facts and circumstances of this case do not support YA Bar's claim. Color of title is created by a document "which has the appearance or gives the semblance of title but is not such in fact." Stevenson v. Owen (1984), 212 Mont. 287, 295, 687 P.2d 1010, 1015. However, not every deficient conveyance will create color of title in the grantee. In Joseph Russell Realty Co. v. Kenneally (1980), 185 Mont. 496, 605 P.2d 1107, this Court found that a claim of color of title must be made in good faith. In denying defendant's claim of color of title, this Court stated:

> Adverse possession under color of title is posses-
> sion based on a written instrument which purports to pass
> title but which in reality does not. . . .
>
> . . .
>
> [Color of title is created by] a title that is
> imperfect, but not so obviously so that it would be
> apparent to one not skilled in the law. (citation
> omitted). Under Montana law, "an instrument which

12

purports to convey land or the right to its possession is sufficient color of title as a basis for adverse possession <u>if the claim is made in good faith</u>." (citations omitted).

<u>Russell,</u> 605 P.2d at 1111.

Ernest B. Harkness purported to transfer sole ownership of the 448.22 acre parcel to YA Bar, a corporation in which he was the president and a major shareholder.. Since Ernest B. had knowledge of Earl's children's interest in the property, this conveyance was not made in good faith. At least one court has held that a grantor cannot create color of title in land in which he does not have an interest by transferring the land to a corporation or a trust in which he has an interest. In State v. King (W.Va. 1915), 87 S.E. 167, the West Virginia Supreme Court concluded that the claimant did not create color of title by deeding land he did not own to a trust which he controlled. The court stated:

> [A] deed made by a man to himself could not well be supposed to have the characteristics of color of title.
>
> . . . .
>
> . . [T]he doctrine [of color of title] fairly and conclusively assumes that there has been a transaction between two or more persons by which a futile effort to pass title from one to another has been made, a transaction in which the actors were prompted by good intentions and honest motives . . .

<u>King</u>, 07 S.E. at 171-72.

This rule of law was confirmed by the West Virginia Supreme Court in State v. Altizer Coal Land Co. (W.Va. 1925), 128 S.E. 286. The court held that a grantor could not create color of title by conveying land which he did not own to a corporation in which he was the president and majority shareholder. <u>Altizer</u>, 128 S.E. at

13

288-90. YA Bar claims to have created color of title in just this manner. Ernest B. owned a 5/6 interest in the 408.22 acre parcel. In 1950 he purported to grant this land to YA Bar as sole owner. YA Bar now claims to hold the parcel under color of title as sole owner. Ernest B. knew of the other interests in the parcel, did not act in good faith in conveying the parcel as sole owner and therefore YA Bar cannot claim to hold the parcel under color of title.

YA Bar is also charged with notice of the various interests in the 40 acre parcel. The Final Settlement and Distribution of Arabina's estate omitted the 40 acre parcel. The quitclaim deeds received by Ernest B. from his four siblings likewise omitted the 40 acres. However, in 1950 when Ernest B. conveyed his property to YA Bar, he included the 40 acre parcel in the conveyance. Ernest B. owned only a 1/6 interest in the 40 acre parcel yet purported to convey the entire parcel as sole owner. The 40 acres was not distributed solely to him by Arabina's Final Settlement and Distribution nor by the quitclaim deeds from his siblings. The "reappearance" of the omitted 40 acres in the deed from Ernest B. to YA Bar puts Ernest B. and YA Bar on further notice of the other potential claims to the 40 acre parcel.

We conclude that the District Court erred in finding that YA Bar had adversely possessed the land of its cotenants. YA Bar did not give the heirs sufficient notice to constitute an ouster under Fitschen or LeVasseur. YA Bar was not a non-knowing cotenant, and

14

therefore the theories discussed in <u>Nicholas</u> and <u>Bennett</u> are inapplicable.

We note that YA Bar was not without a remedy when it wished to extinguish the cotenancy. A party is not bound to remain an unwilling cotenant with another party. The law provides a remedy through the laws of partition. A cotenant can institute partition proceedings to have the cotenancy terminated and the land or the proceeds from the sale of the land equitably divided. Sections 70-29-101 through -221, MCA.

We reverse the decision of the District Court.

_J. A. Turnage_
Chief Justice

We concur:

Karla M. Gray

Terry Trieweiler

William E. Hunt

_Justices_

Hon. Jeffrey Langton, District Judge, sitting in place of Justice John C. Harrison

15

December 23, 1994

CERTIFICATE OF SERVICE

I hereby certify that the following certified order was sent by United States mail, prepaid, to the following named:

STUART R. WHITEHAIR
Attorney at Law
P.O. Box 6493
Bozeman, MT 59715

Carl M. Davis
SCHULZ, DAVIS & WARREN
P.O. Box 187
Dillon, MT 59725

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY:_____
Deputy